**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:23-cv-03088-NYW-KAS

RIKKI MCALISTER, individually and on behalf of all
similarly situated persons,

*Plaintiff*,

v.

LGI Homes Corporate, LLC,

*Defendant.*

---

**DEFENDANT LGI HOMES CORPORATE, LLC'S MOTION FOR SUMMARY
JUDGMENT PURSUANT TO FED. R. CIV. P. 56**

---

Defendant LGI Homes Corporate, LLC ("LGI" or the "Company"), by its

undersigned counsel, submits its Motion for Summary Judgment Pursuant to Fed. R. Civ.

P. 56 (the "Motion"), and states as follows:

## I.      STATEMENT OF UNDISPUTED MATERIAL FACTS

### A.  LGI Homes Company Background.

1.      LGI Homes is a residential home builder that sells homes in Colorado and

several other states. [**Ex. 1, LGI HOMES 0013981; 001443; 001520; 001572; 001660;

001711; 001799; 001859; 001866; 001957; 002062; 002114; 002181; 002265; and

002331.**].

2.      More than 95% of LGI Homes' annual dollar volume of revenue comes from

the retail sales of homes that it builds. [***Id***].

1

3.     LGI Homes is headquartered in The Woodlands, Texas, a suburb of Houston. [*Id.*; ¶13, **Dkt. #40-1**].

4.     From its company headquarters, among other things, LGI Homes:

a.     Trains New Home Consultants ("Sales Representatives"). [**Ex. 2, Pl.'s Dep. Tr. 45:5-48:23; ¶13, Dkt. #40-1**].

**b.**     Keeps and maintains all payroll and benefits records for Sales Representatives. [**Ex. 3, Sonier Dep. Tr. 13:18-14:3, 14:20-25**].

**c.**     Sets employment policies for Sales Representatives; [**Ex. 3, Sonier Dep. Tr. 31:3-16**].

d.     Determines rates of pay and compensation for Sales Representatives; [**Ex. 3, Sonier Dep. Tr. 30:21-31:2**].

e.     Makes termination decisions for all employees including Sales Representatives. [**Ex. 3, Sonier Dep. Tr. 30:15-20**].

5.     LGI Homes Sales Representatives sell homes the LGI Way – that is a LGI's new homes sales process. [**Ex. 3, Sonier Dep. Tr. 48-51:8-12; Ex. 2, Pl.'s Dep Tr. 52:18-58:19; Ex. 4, Hamroun Dep. Tr. 72:13-77:3**].

6.     LGI Homes pays Sales Representatives on a commission basis with a recoverable draw. [**Ex. 5, LGI HOMES 00028: Ex. 6, LGI HOMES 00806**].

7.     They also receive bonuses and job titles commensurate with the number of homes closed each year. [**Ex. 6, LGI HOMES 00806**].

8.     For example, Sales Representatives who sell more than 40 homes in a calendar year earn the title of Sales Master and earn bonuses totaling $67,500. [**Ex. 7, LGI HOMES 00828**].

2

9.      In each LGI Homes community in Colorado, the Company converts a residential home into a temporary sales office where Sales Representatives can receive clients, check client credit scores, and complete closing documents. [**Ex. 3, Sonier Dep. Tr. 26:3-27:14].**

10.      From sales offices, Sales Representatives can also review client leads, make client calls, and set up appointments for clients to tour LGI Homes communities and various model homes.  **[Ex. 8, LGI HOMES 00153; Ex. 4 Hamroun Dep. Tr. 58:12-67:16**].

11.      Importantly, Sales Representatives are required to drive customers around the community and to tour the target house for that particular customer. [**Ex. 2, Pl.'s Dep Tr. 140:2-24**].

12.      Once all the sales at an LGI community have been completed in the LGI Homes community, the sales office is converted back into a home and sold. [**Ex. 3, Sonier, Dep. Tr. 27:5-14**].

13.      In both 2016 and 2019, LGI Homes retained outside counsel to conduct a review of sales representatives' exemption status, to determine whether this position is exempt under the federal Fair Labor Standards Act's Outside Sales Exemption. [**Ex. 9, Legal Memos, LGI HOMES 01026 – 01032; LGI HOMES 01033 - 01042; Ex. 3, Sonier Dep. Tr. 46:5-16**].

### B. Plaintiff's Educational Background/Prior Work Experience.

14.      Before joining LGI Homes in January 2016, Plaintiff completed an online real estate course, and passed the Colorado real estate license exam. [**Ex. 2, Pl.'s Dep Tr. 9:12-10:1**].

3

15.     Plaintiff worked as a legal secretary for 5 years, where she helped draft, review, and proofread legal documents for a small law firm that handled divorces, wills, estates, and other general legal matters. [**Ex. 2, Pl.'s Dep. Tr. 12:9-13:10; 39:5-10**].

16.     The lawyers that she worked for told her that it was important to have correct documents that she was responsible for proofreading. [***Id.* at Pl.'s Dep. Tr. 39:5-10**].

17.     And immediately before joining LGI Homes, Plaintiff worked for a water and restoration company where she earned a salary and commissions for 21 years. [**Ex. 2, Pl.'s Dep. Tr. 10:14-23**].

**C. Plaintiff's Interview and Job Offer from LGI Homes.**

18.     In the summer of 2014, Plaintiff attended a LGI Homes conference at a Westin hotel in Westminster, Colorado. [**Ex. 2, Pl.'s Dep Tr. 18:8-19:4**].

19.     At the conference, she participated in a "speed interview" with a LGI Homes representative. [***Id.***]

20.     In September and October 2014, Plaintiff participated in two additional interviews at the Westin hotel with vice presidents of LGI Homes. [**Ex. 2, Pl.'s Dep Tr. 25:1-4, 26:3-27:5**].

21.     On or around December 2, 2015, Plaintiff participated in an all-day interview where she shadowed another sales representative and met with Kevin Wolf and Lisa Brown, sales managers for LGI Homes. [**Ex. 2, Pl.'s Dep Tr. 35:17-37:22**].

22.     That same day, LGI Homes presented Plaintiff with a written job offer ("Offer Letter"). [**Ex. 6, LGI HOMES 00806**].

23.     The Offer Letter expressly states:

You will be paid "a Recoverable Draw of $1,384.62 per pay period

4

> ($9,000.00 per quarter) compared against commissions earned on a quarterly basis. The maximum deficit allowed is $12,000.00.  If you exceed the $12,000.00 maximum deficit, you no longer receive the recoverable draw but you will be paid on the first 2 units closed each month.  All units closed above the first 2 will reduce your draw deficit. Any bonus will go towards deficit."

[*Id*.].

24.     Plaintiff read the offer letter before signing it on December 5, 2015. [**Ex. 2, Pl.'s Dep. Tr. 36:15-17**].

25.     Plaintiff concedes she did not ask questions about the terms of the Offer Letter, including the recoverable draw. [**Ex. 2, Pl.'s Dep Tr. 38:8-16**].

26.     Plaintiff signed the Offer Letter on December 5, 2015. [**Ex. 6, LGI HOMES 00806**].

### D.  Plaintiff's Sales Representative Position.

27.     On January 4 to January 7, 2016 and January 16th to 21st, 2022, Plaintiff attended sales training at the Company's corporate headquarters in The Woodlands, Texas. [**Ex. 2, Pl.'s Dep. Tr. 45:2-22; Ex. 6, LGI HOMES 00806**].

28.     During this sales training, Plaintiff was instructed about the LGI Way—the Company's proprietary sales process for selling new homes. [**Ex. 2, Pl.'s Dep. Tr. 45:2-2, 48:17-23, 52-57:18-9, 60-70:16-19, 79-96:21-13, 101-111:15-3, 112-114:22-22**].

29.     During the sales training and the first 100 days, Plaintiff was paid $9,890,11 for training. [**Ex. 6, 00806; Ex. 2, Pl.'s Dep. Tr. 45-46;18-10; Ex. 3, Sonier Dep. Tr. 33-34:20-1**].

30.     Once the Plaintiff completed sales training, she transitioned to commission and the recoverable draw. [**Ex. 6, 00806; Ex. 3, Sonier Dep. Tr. 34:4-11**].

5

31.    Plaintiff worked for LGI Homes as a Sales Representative from January 4, 2016 until February 9, 2023.  **[Ex. 2, Pl.'s Dep. Tr. 16:2-4; 209:23-25; Ex. 10 LGI HOMES 00803**].

32.    Plaintiff worked at several different LGI Homes communities and did not work at LGI's corporate headquarters in The Woodlands, Texas. [**Ex. 2, Pl.'s Dep. Tr. 72-73:15-19**].

33.    In this role, Plaintiff's job duties and responsibilities included:

a.  Calling leads. [**Ex. 2, Pl.'s Dep. Tr. 166:10-12**].

b.  Placing follow-up calls with customer leads. [**Ex. 2, Pl.'s Dep. Tr. 166:13-15; Ex. 11, Performance Tracking System Reports, LGI Homes 01128 - 01379**].

c.  Scheduling appointments with customers.  [**Ex. 2, Pl.'s Dep. Tr. 166:16-18**].

d.  Meeting customers; [**Ex. 2, Pl.'s Dep. Tr. 166:19-21**].

e.  Touring model homes with customers; [**Ex. 2, Pl.'s Dep. Tr. 166:22-167:3; Ex. 13, LGI HOMES 01066-01073**].

f.  Preparing the sales office to receive customers and make sales. [**Ex. 2, Pl.'s Dep. Tr. 167:10-168:13**].

34.    LGI Homes required Plaintiff to have a "four door vehicle" to transport customers to various locations around the community and model homes. [**Ex. 2, Pl.'s Dep Tr. 101:15-101:1; Ex. 12, LGI HOMES 00804; 00815; 00819; 00822; 00825; 00827; 00830**].

35.    LGI Homes did not allow Plaintiff or other Colorado Sales Representatives

6

to have their own personal computer to complete work. [**Ex. 4, Hamroun Dep. Tr. 67:11-16; Ex. 2, Pl.'s Dep Tr. 150:21-151:2**].

36.     LGI Homes has established policies contained within the Company's Employee Handbook "which outlines the goals, policies, benefits and expectations of LGI Homes . . . as well as my responsibilities as an employee." [**Ex. 14, LGI Homes 00807**].

37.     Plaintiff acknowledged, accepted, and agreed to comply with these policies on several occasions during her employment. [**Ex. 15, LGI HOMES 00800**].

38.     Among these policies, LGI Homes maintained policies expressly providing rest periods (breaks) for its Colorado employees, such as Plaintiff.  [**Dkt. #40-6**].

39.     Sales managers did not prevent Sales Representatives from taking breaks. [**Ex. 2, Pl.'s Dep. Tr. 164:1-4**].

40.     There was no express LGI Homes policy prohibiting or discouraging Sales Representatives from taking rest breaks. [**Ex. 2, Pl.'s Dep. Tr. 224:18-25**].

**E.  Plaintiff's Compensation.**

41.     Plaintiff was paid on commission, less a recoverable draw. [**Ex. 6, LGI HOMES 00806**].

42.     Each pay period, Plaintiff received a recoverable draw.  When her commissions exceeded her quarterly recoverable draw amount, she earned commissions above the recoverable draw amount. [**Ex. 3, Sonier Dep. Tr. 34:9-18; Ex. 6, LGI HOMES 00806**].

43.     During her employment at LGI Homes, Plaintiff earned $1,550,144.05 in gross commissions, she received $245,246.51 for the recoverable draw, and she netted $1,308,435.00. [**Ex. 16, LGI HOMES 01046-47**].

44.     Plaintiff also received several volume bonuses based on her annual home sales. [**Ex. 17, LGI HOMES 01025**].

45.     Plaintiff's gross pay, commission pay, draw, volume bonuses and net pay for each year that she worked for LGI Homes was as follows:

    a.   In 2016, Plaintiff's gross pay was $67,423.59, her commissions were $31,937.68, her draw was $25,417.70, and her training pay was $9,890.11, and her net pay was $42,200.50 [**Ex. 17, LGI HOMES 01025**];

    b.   in 2017 her gross pay was $205,652.04, her commission pay was $167,178.75, her draw was $36,000.12, her vacation bonus was $2,000.00, and her net pay was $125,013.49 [***Id***.];

    c.   in 2018, Plaintiff's gross pay was $461,381.24, her commission pay was $369,448.75, her draw was $36,000.12, she received a vacation bonus of $2,000.00, her volume bonus was $52,500.00, and her net pay was $270,365.94 [***Id***.];

    d.   in 2019 Plaintiff's gross pay was $175,817.89, her commission pay was $137,441.22, her draw was $28,107.78, her vacation bonus was $6,000.00, her volume bonus was $67,500.00, and her net pay was $99,110.40 [***Id***.];

    e.   in 2020, Plaintiff's gross pay was $419,662.74, her commission pay was $311,482.40, her draw was $36,000.12, her vacation bonus was $2,000.00, her volume bonus was $67,500.00, and her net pay was $236,588.19 [***Id***.];

    f.   in 2021 Plaintiff's gross pay was $551,105.00, her commission pay was $437,293.50, her draw was $36,000.12, her vacation bonus was $6,000.00, her volume bonus was $70,000.00, and her net pay was $309,229.39 [***Id***.];

g.  in 2022 her gross pay was $163,866.92, her commission pay was $95,361.75, her draw was $38,538.59, her vacation bonus was $4,000.00, her auto allowance was $3,000.00, her volume bonus was $20,000.00, and her net pay was $79,192.72 [*Id*.]; and,

h.  in 2023[1] Plaintiff's gross pay was $13,514.14, her commission pay was $0.00, her draw was $7,200.00, her auto allowance was $2,000.00, phone allowance was $250.00, her vacation bonus was $4,000.00, and her net pay was $9,322.95 [*Id*.].

46.   Plaintiff testified that she did not understand what a draw was and that she asked Lisa Brown, a sales manager, about the draw but did not get an answer. [**Ex. 2, Pl.'s Dep. Tr. 16:9-20, 23-25; 17:1-2, 5-16; 36:3-17; 30:1-21**].

47.   However, Plaintiff acknowledged that the interview "was an all-day thing." [**Ex. 2, Pl.'s Dep. Tr. 36-37:18-3**].

48.   Plaintiff also stated that she didn't understand what a "draw" was, and that she would not have accepted this job if she knew that she had to pay back the draw. [**Ex. 2, Pl's Dep. Tr. 37-38:23-7**].

49.   Ms. Sonier testified that if an employee was negative with respect to their draw, when they left LGI Homes, they would not have to pay the draw back. [**Ex. 3, Sonier, Dep. Tr. 75:12-16**].

50.   LGI Homes also provided Plaintiff with a pay stub each pay period. [**Ex. 18, LGI HOMES 00839—01024**].

---

[1] Plaintiff resigned her employment with LGI Homes on February 9, 2023. [**Ex. 28, LGI HOMES 00833**].

51.    Each pay stub contains the following information:

    a. Regular rates of pay. [*Id*.]

    b. Gross wages earned. [*Id*.]

    c. Withholdings made. [*Id*.]

    d. Net amounts paid each pay period. [*Id*.]

**F.  Plaintiff's Weekly Work Schedule.**

52.    LGI Homes scheduled Plaintiff to work 5 days per week, except during COVID, when she worked a reduced in office schedule. [**Ex. 19, LGI HOMES 00801; Ex. 20, 00814, 00818, 00821, 00824, 00826, 00831; Ex. 21, LGI HOMES 01381 - 01390**].

53.    Plaintiff worked on Thursdays, Saturdays, and Sundays. [**Ex. 2, Pl.'s Dep. Tr. 127:21**].

54.    Plaintiff also worked two other days throughout the week that changed depending upon the schedule. **[*Id.*, Pl.'s Dep. Tr. 128:13**].

55.    Plaintiff testified that she often arrived at the sales office at 4:30 a.m. on Saturdays, in order to obtain the overnight leads before other sales representatives arrived to claim such leads. [*Id.*, **Pl.'s Dep. Tr. 72:15-17**].

56.    Plaintiff also testified that no one at LGI Homes required her to arrive at 4:30 a.m., and that other sales representatives arrived for work at the scheduled time (8:00 a.m.).[*Id.*, **Pl.'s Dep. Tr. 131:7-16**].

57.    Plaintiff generally worked between 8 and 40 hours per week during her employment. [**Ex. 22, MCALISTER_Bates 0547-49**].

    a. From May 13, 2017 to May 26, 2017, Plaintiff claims she worked "at least 70 hours during the pay period" or an average of 35 hours per week. [**Pl.'s**

**Cpl. Dkt. #7, p. 4, ¶ 19**].

b.  From October 10, 2020 to October 23, 2022, she worked "at least 75 hours during the pay period" or an average of 37.5 hours per week. [**Dkt. #7, p. 4, ¶ 19; Dkt. #34-3, p. 4, ¶ 9**].

c.  From July 16 to July 29, 2022, she worked "at least 75 hours during the pay period" or an average of 37.5 hours per week. [**Dkt. #7, p. 4, ¶ 19; Dkt. #34-3, p. 4, ¶ 9**].

58.     In November 2022, in a Colorado Division of Unemployment Insurance application, Plaintiff asserted that her weekly hours worked were reduced from 40 hours per week to 8 hours per week.  [**Ex. 22, MCALISTER_Bates 0547-49**].

**G. Plaintiff's Rest Breaks.**

59.     Plaintiff routinely took 10-minute rest periods during her employment at LGI Homes:

a.  Made personal phone calls to 16 individuals totaling 75,064 minutes on days she claims she worked for LGI Homes. [**Ex. 23, MCALISTER_Bates 004914_007395;   MCALISTER_Bates0155-0546;   Ex.   24,   VERIZON 000001-001195; Ex. 2, Pl.'s Dep. Tr. 175-176:23-22; 176-177:25-6; 177-178:23-21; 179-182:2-3; Ex. 25, Pl.'s Dep. Ex. 26; Ex. 2, Pl.'s Dep. Tr. 175-176:23-22; 176-177:25-6; Ex. 26, ¶ 23,Melinda Malyuk Decl.; Ex. 27, Personal Calls Summary Chart**].

b.  Cooked lunch; [**Ex. 2, Pl.'s Dep. Tr. 157:5-7, 13-25; 158:2-7, 158:7-17, 159:9-12**].

c.  Ate lunch. [***Id.*, Pl.'s Dep. Tr. 157:5-7, 13-25**].

     d.   Cooked dinner; [*Id.*, **Pl.'s Dep. Tr. 157:5-7, 13-25; 158:2-7, 158:7-17**].

     e.   Used the restroom. [*Id.*, **Pl.'s Dep. Tr. 153:7-11**].

60.    On Thursdays, LGI Homes also scheduled rest breaks for Sales Representatives during the weekly sales meeting. [**Ex. 3, Sonier Dep. 52:13-21, 53:10-15**].

**H.  Plaintiff's Reduced Hours During COVID.**

61.    LGI put in place a code of protocol for COVID between March and September of 2020 (the "Protocol").  [**Ex. 2, Pl.'s Dep Tr. 169:22-25**].

62.    During the Protocol, Sales Representatives were only scheduled to be in the sales office for four-hour shifts, instead of eight-hour shifts. [*Id.* **at 171-172:19-13**].

63.    Plaintiff would work remotely after her scheduled four-hour shift. [*Id.*].

64.    On Saturdays during the Protocol, Sales Representatives would only work from 8:00 a.m. to noon, or 12:00 p.m. to 4:00 p.m. at the sales office. [*Id.* **at 174:12-21**].

65.    Plaintiff resigned from LGI Homes on February 9, 2023. [**Ex. 28, LGI HOMES 00833**].

66.    On April 3, 2023, Plaintiff sent LGI Homes a written demand letter. [**Ex. 29, Sonier Dep. Ex. 10, MCALISTER_bates 0152**].

67.    On April 21, 2023, LGI Homes sent a response to Plaintiff's demand letter. [*Id.* **Sonier Dep. Ex. 10, MCALISTER_bates 0153**].

**II.   LEGAL ANALYSIS**

**A.**   **Plaintiff is Exempt from the Overtime and Rest Period Requirements contained in the Applicable Colorado Overtime and Minimum Pay Standards ("COMPS") Orders and Colorado Minimum Wage Orders ("MWOs"), under the Outside Salespersons Exemption**.

The applicable COMPS Orders and MWOs provide for an exemption from overtime and rest periods if an employee is engaged in outside sales. *See* 7-CCR 1103-1:2.2.4 COMPS 38 (effective 1/1/22-12/31/23), 37 (effective 1/1/21-12/31/21), 36 (effective 7/15/20-12/31/20, 3/16/20-7/14/20); MWO 7-CCR 1103-1:5 (d) 35 (effective 1/1/20-3/16/20, 1/1/19-12/31/20), 34 (effective 1/1/18-12/31/18), 33 (effective 1/1/17—12/31/17), 32 (effective 1/1/16-12/31/16), and 31 (effective 1/1/15-12/31/15). Under Colorado law, exemptions from the COMPs Orders and MWOs are to be narrowly construed. *See Gomez v. JP Trucking, Inc.,* 509 P.3d 429, 436 (Colo. 2022) (Colorado courts must construe exemptions to MWOs "narrowly"); *see also Comm'r v. Clark*, 489 U.S. 726 (1989) (noting that if "a general statement of policy is qualified by an exception, we usually read the exception narrowly in order to preserve the primary operation of the provision").

The applicable COMPS Orders and MWOs define Colorado's Outside Salespersons Exemption[2] as follows:

**Outside Salesperson:** any person employed primarily away from the

---

[2] The FLSA also has an Outside Sales Exemption, 29 C.F.R. § 541.500 that is similar to Colorado's Outside Salespersons Exemption, but it is not identical. In the FLSA version, it refers to "customarily and regularly engaged away from the employer's place or places of business." The Colorado exemption refers to being "primarily away from the employer's place of business or enterprise." *See* COMPS Orders and MWOs. The FLSA version does not reference "enterprise." LGI Homes retained outside counsel in 2016 and 2019 to determine if the FLSA version was applicable to its Sales Representatives. [**Ex. 9, LGI HOMES 01032 – 01042**].Outside counsel determined that it was applicable citing a 2007 U.S. Dept. of Labor Wage and Hour Administrator Opinion Letter that opined, in part, that home sales employees in subdivisions are exempt under the FLSA's Outside Sales Exemption,

13

**employer's place of business or enterprise** for the purpose of making sales or obtaining orders for any commodities, articles, goods, real estate, wares, merchandise or services. Such outside sales employees must spend a minimum of 80% of the workweek in activities directly related to their outside sales.

*Id.* (Emphasis added.)

> 1.   *Plaintiff was primarily employed away from LGI Homes' place of business or enterprise*.

Neither the applicable COMPS Orders, nor the MWOs define "employer's place of business or enterprise," nor do any Colorado state courts, District of Colorado, nor Tenth Circuit cases define these terms[3]. Under these circumstances, the Colorado Supreme Court has held that the construction of an administrative regulation is guided by the same

---

> Sales employees generally leave the model home or trailer one or two times per week, to engage in selling or sales-related activities. . . an 'indispensable component' of the outside sales employee's sales effort is to take the customer out to various home-sites within the community . . . [and] may take customer to view homes under construction or recently-completed. All of these sales activities are certainly critical . . . of the overall sales effort and would almost always have to occur away from the model home. Accordingly, the described activities qualify as being 'customarily and regularly engaged away from the employer's place . . . of business. Therefore, the sales employees in question are exempt outside salespersons.

*See* WHD FLSA 2007-2 Advisory Opinion; [**Ex. 9, LGI HOMES 01026 - 01030; and 01030 - 1042**].

[3] The Colo. Dept. of Labor and Employment ("CDLE") issues Interpretative Notice and Formal Opinions ("INFOS") and other published guidance construing wage and hour regulations. Other than the definition of "Outside Salesperson," which is contained in the applicable COMPS Orders and MWOs, the CDLE has not issued any further guidance on the "Outside Salespersons" exemption, nor has the CDLE issued any guidance on "employer's place of business or enterprise." Moreover, on June 24, 2019, the CDLE issued a Notice Regarding Opinion/Exemption Letters and rescinded all prior opinion/exemption letters issued by the CDLE. [**See Ex. 30, ¶ 4., CDLE Notice Regarding Opinion/Exemption Letters**].

principles that apply to statutory interpretation. *See Gomez v. JP Trucking, Inc.,* 509 P.3d 429, 436 (Colo. 2022). In *Gomez*, the Colorado Supreme Court explained that its goal in interpreting a regulation "is to give effect to the promulgating body's intent." *Id*. If a regulation is unambiguous, the court will enforce it as written, giving the words and phrases their common and ordinary meaning. *Id*. In this situation, the court will not rely on other canons of construction." *Id*. However, "if the language of a regulation is ambiguous, the court may resort to other interpretative aids to discern the drafters' intent." *Id*. "A statute [regulation] is ambiguous when it is reasonably susceptible of multiple interpretations." *See Elder v. Williams*, 477 P.3d 694, 698 (Colo. 2020). But "to the extent that language of a [regulation] is susceptible of more than one reasonable interpretation, and is therefore considered ambiguous, a substantial body of interpretative aids . . . is available to assist in determining which of these reasonable understandings embodies the [enacting body's] intent." *People v. Opana,* 395 P.3d 757, 760 (Colo. 2017).

Here, the terms, "employer's place of business or enterprise," are ambiguous, because these terms are reasonably susceptible to multiple interpretations. *See People v. Weeks,* 369 P.3d 699, 711 (Colo. App. 2015) (holding that a statute was ambiguous where "the last phrase could be read as applying to all of the enumerated [categories] or only the last one"). For example, an employer's place of business could refer to its' corporate headquarters, or it could refer to a location where its employee's work.  The applicable COMPS Orders refer to "prescribed workplace," "travel to and from a work station," and "work site," in describing locations where employees work. *See* COMPS Orders 7-CCR 1103-1:1.1.9; 1.9.2; and 7.4.1. Similarly, the applicable MWOs refer to "place of employment" and "work site," when referring to where an employee works. *See*

MWOs 7-CCR 1103-1, ¶¶ 2 (Time Worked), 12, 21. The MWOs also use the term "employer's principal place of business in Colorado," but this term immediately precedes "place of employment," when addressing an employer's recordkeeping requirements. *Id*. at ¶ 12.  The Outside Salesperson Exemption does not use any of these terms to describe where employees work. Instead, the Exemption refers to "employer's place of business or enterprise." *Id*. at 2.2.4.

Plaintiff may contend that all of these terms are interchangeable, but they are not. If the CDLE had intended to only refer to a location where an employee performs their work, the CDLE could have referred to "place of employment," "workplace," "work station," or "work site," in the Outside Salesperson Exemption, but it specifically referenced "employer's place of business or enterprise," which denotes a more precise definition concerning these terms. This is buttressed by the inclusion of "enterprise" in this exemption.[4]

While "place of business or enterprise" is not defined in either the applicable COMPS Orders or MWOs, nor is it defined in Colorado case law dealing with exemptions

---

[4] Merriam-Webster Dictionary defines "enterprise" as "(1) a project or undertaking that is especially difficult, complicated, or risky; (2) *a unit of economic organization or activity [especially: a business organization]*; and (3) readiness to engage in daring or difficult action: initiative." *See Merriam-Webster Collegiate Dictionary,* 11th ed. (2020) (Emphasis added.). Black's Law Dictionary defines enterprise as: "(1) *An organization or venture, esp. for business purposes*; (2) Under federal antiracketeering law, an individual, partnership, corporation, association, union, other legal entity, or group of individuals associated in fact, although not a legal entity; (3) *One or more persons or organizations that have related activities, unified operation or common control, and common business purpose*." (Emphasis added.); *Renfandt v. N.Y. Life Ins. Co.*, 419 P.3d 576, 580 (Colo. 2018) ("When determining the plain and ordinary meaning of words," the Colorado Supreme Court often looks to "definitions in a recognized dictionary." Such dictionaries include Merriam-Webster Online Dictionary ("Merriam-Webster") and "Black's Law Dictionary").

from these Orders, the FLSA ***does*** provide a definition of "enterprise". Under that definition,

> "Enterprise" means the related activities performed (either through unified operation or common control) by any person or persons for a common business purpose, and includes all such activities whether performed in one or more establishments or by one or more corporate or other organizational units including departments of an establishment operated through leasing arrangements….

29 U.S.C. § 203(r)(1).[5]  Thus, under the FLSA, "[a]n enterprise exists when there are (1) related activities (2) performed through unified operation or common control (3) for a common business purpose."  *Wirtz v. First Nat. Bank & Tr. Co*., 365 F.2d 641, 643 (10th Cir. 1966).

When this definition of "enterprise" is applied to the exemption at issue, the reason for including that term in addition to "employer's place of business" becomes apparent. The application of the exemption depends upon whether the employee performs his or her work at or away from the employer's "place of business or enterprise.

Here, it is undisputed that Plaintiff spent more than 80% of her workweek on outside sales activity away from any LGI's corporate headquarters in The Woodlands, Texas.  [**Ex. 2, Pl.'s Dep. Tr. 72-73:15-19; ¶13, Dkt. #40-1**].

Alternatively, the "nerve center" test that the U.S. Supreme Court has adopted for determining a corporation's principal place of business for diversity jurisdiction purposes can also provide guidance in addressing this ambiguity. *Hertz Corp. v. Friend,* 559 U.S.

---

[5] It is appropriate to look to the FLSA in construing the COMPS and MWOs, as they are analogous.  "[W]here a state law is patterned after a federal law or designed to implement its policies, federal constructions of the law 'should be accorded great weight.'"  *Deherrera v. Decker Truck Line, Inc*., 820 F.3d 1147, 1161 (10th Cir. 2016) (*quoting People v. Gallegos*, 251 P.3d 1056, 1062 (Colo. 2011).

77, 92-93 (2010). Under this test, a corporation's "principal place of business," for purposes of deciding whether a federal court may exercise diversity jurisdiction over a suit involving the corporation, is the same as its "nerve center," or the place where the corporation's high-level officers direct, control, and coordinate the corporation's activities. [*Id.* **at 92-93**]. A corporation's "nerve center" is normally, the location of its headquarters, provided that the headquarters is the actual center of direction, control, and coordination. [*Id.* **at 93**].

LGI Homes "nerve center"/company headquarters is in The Woodlands, Texas, a suburb of Houston. [**Ex. 1, LGI HOMES 001443; 001572; 001711; 001859; 001866; and 002331**]. Training of New Home Consultants/Sales Representatives takes place in The Woodlands. [**Ex. 6, LGI HOMES 00806**]. The C-Suite level executives work at LGI Homes' headquarters. [**Ex. 3, Sonier Dep. Tr. 30:15-20**]. All payroll and personnel records are kept and maintained at LGI Homes' headquarters. [*Id.*, **Sonier, Dep. Tr. 13:18-14:3, 14:20-25**]. All termination decisions are made by LGI Homes' president and chief financial officer. [*Id.* **Sonier, Dep. Tr. 30:15-20**]. Although, Plaintiff underwent her initial training as a Sales Representative at LGI Homes' headquarters in The Woodlands, Plaintiff did not work there, Plaintiff worked at several different LGI Homes communities in Colorado. [**Ex. 2, Pl.'s Dep. Tr. 72-73:15-19**]. None of these communities were LGI Homes' "place of business" or "enterprise." [**Ex. 2, Pl.'s Dep. Tr. 45:5-48:23; ¶13, Dkt. #40-1; Ex. 3, Sonier Dep. Tr. 13:18-14:3, 14:20-25; 30:15-31:2;**].

Plaintiff sold homes for the Company. [**Ex. 2, Pl.'s Dep. Tr. 45:2-2, 48:17-23, 52-57:18-9, 60-70:16-19, 79-96:21-13, 101-111:15-3, 112-114:22-22**]. Plaintiff spent more than 80% of her workweek on outside sales activity away from LGI's corporate

headquarters. [**Ex. 2, Pl.'s Dep. Tr. 72-73:15-19**]. Thus, Plaintiff is properly classified as being exempt under the Outside Salesperson Exemption contained in the applicable COMPS Orders and MWOs.

> **B.**   **Plaintiff is Exempt from the Overtime Requirements contained in the applicable COMPS Orders because Plaintiff is subject to the Commission Sales Exemption for 82 of her Pay Periods**.

Plaintiff, as a Sales Representative, sold new homes for LGI, and she was paid on commission. [**Ex. 19 LGI Homes 00801; Ex. 10, LGI Homes 00803; Ex. 12, LGI Homes 00804; Ex. 6, LGI Homes 00806; Ex. 17, LGI Homes 1025**]; *Brennan v. Broadmoor Hotel, Inc*., 535 P.3d 1016, 1022 (Colo. App. 2023) (". . . a sales employee unambiguously means someone employed for the purpose of making sales."). The Commission Sales Exemption provides,

> Commission Sales. Sales employees of retail or service industries paid on commission basis, provided that at least 50% of their total earnings in the pay period is derived from commission sales, and their regular rate of pay is at least one and one-half times the minimum wage, are exempt from Rule 4 (Overtime). This exemption is applicable for only employees of retail or service employers who receive over 75% of their annual dollar volume of from retail or service sales.

*See* COMPS Orders 36 (7 CCR 1103-1, 2.4.2); 37 (7 CCR 1103-1, 2.4.2); 38 (7 CCR 1103-1, 2.4.2); and MWOs 31 (7 CCR 1103-1, 6(b)); 32 (7 CCR 1103-1, 6(b)); 33 (7 CCR 1103-1, 6(b);, 34 (7 CCR 1103-1, 6(b)); and 35 (7 CCR 1103-1, 6(b)).

> 1.   *LGI Homes Derives more than 75% of its Revenue from Retail Home Sales[6]*.

As set forth in the Company's 10k SEC filings, LGI Homes is a residential home

---

[6] Courts in this District have defined Retail and Service as "any business or enterprise that sells or offers for sale, any service, commodity, article, good, ***real estate***, wares, or merchandise to the consuming public that generates 50% or more of its annual dollar volume of business" from sales. *Meneocal v. GEO Grp., Inc.,* 113 F. Supp. 3d 1125, 1130 (D. Colo. 2015) (*quoting* 7 CCR 1103-1:2(A)). (Emphasis added.)

builder that derives more than 75% of its annual dollar volume from retail sales of newly constructed homes. [**Ex. 1, LGI Homes 001443; 001572; 001711; 001859; 001866; and 002331**]. In fact, almost all of LGI Homes' annual dollar volume of revenue comes from the retail sales of homes that it builds[7]. *Id*.

        2.    *More than 50% of Plaintiff's Total Earnings were Derived from Commission Sales.*

Plaintiff was paid on commission, less a recoverable draw. [**Ex. 6, LGI Homes 00806; Ex. 3, Sonier Dep. Tr. 34:9-18; Ex. 6, LGI HOMES 00806**]. Plaintiff also received several bonuses based on her home sales. [**Ex. 17, LGI HOMES 01025**]. Exhibit 20, LGI HOMES 1025 is an Excel Spreadsheet showing Plaintiff's Payroll Summary, including gross pay, net pay, commissions, draw, deductions, and taxes from 2016 to 2023 ("Payroll Spreadsheet"). Exhibit 19, LGI HOMES 01046—01047 is a Summary of Commissions v. Draws Paid, which reflects that during the six years that Plaintiff worked for LGI Homes she earned $1,550,144.05 in gross commissions, she received $243,264.51 for the recoverable draw, which was deducted from her commissions on a quarterly basis, and she netted $1,308,435.00 (not including mandatory and elective withholdings). [**Ex. 16, LGI Homes 01046—01047; Ex. 6, LGI HOMES 00806**]. These exhibits demonstrate that more than 50% of Plaintiff's total earnings were derived from

---

[7] Neither the applicable COMPS Orders, nor MWOs define "annual dollar volume of sales," but 29 C.F.R. § 779.265 Methods of computing annual volume sales, states in part, "The "annual dollar volume of sales" consists of gross receipts from all sales during a 12-month period. Under, 29 C.F.R. § 779.266, also provides in part, "No computations of annual dollar volume are necessary to determine coverage or exemption in those enterprises in which the gross receipts regularly derived each year from the business are known by the employers to be substantially in excess or substantially under the minimum dollar volume specified in the applicable provisions of the Act [FLSA]."

commission sales. *Id.*

    3.    *Plaintiff's regular rate of hourly pay during 82 pay periods was at least one and one-half times the minimum wage*.

During Plaintiff's nearly seven years of employment, she had 151 pay periods. [**Ex. 18, LGI HOMES 00839—01024**]. Of those pay periods, Plaintiff's regular rate of hourly pay was at least one and one-half times the applicable minimum wage as set forth in either the COMPS Orders or MWOs[8]. *Id*. Plaintiff only received a draw with no commissions for 69 pay periods, as set forth in Paragraph D., below the recoverable draw is a payroll advance and constitutes taxable income (wages). *Id*.

As such, Plaintiff is subject to the Commission Sales Exemption under the applicable COMPS Orders and MWOs for the 82 pay periods where her compensation was 1.5 times the applicable minimum wage.

**C.    <u>Even if Plaintiff is not Exempt from Minimum Wage and Overtime Requirements contained in the applicable COMPS Orders and MWOs, Plaintiff's Rest Period Claim Fails, because she took numerous Rest Periods (breaks) during her Workdays</u>.**

Discovery in this case shows that Plaintiff had discretion to take a 10-minute rest period for every 4 hours that she worked, including personal appointments during her scheduled workdays. [**Ex. 23, MCALISTER_Bates 004914_007395; MCALISTER_Bates0155-0546; Ex. 24, VERIZON 000001-001195; Ex. 2, Pl.'s Dep. Tr. 175-176:23-22; 176-177:25-6; 177-178:23-21; 179-182:2-3; Ex. 25, Pl.'s Dep. Ex. 26; Ex. 26, ¶ 23, Melinda Malyuk Decl.; Ex. 2, Pl.'s Dep. Tr. 157:5-7, 13-25; 153:7-11;**

---

[8] The applicable COMPS Orders and MWOs use the "Regular rate of pay" in calculating the hourly rate for a non-overtime workweek. Overtime compensation is based on an hourly regular rate calculated from the employee's pay. *See* COMPS Orders 7 CCR 1103-1, 1.8; and MWOs Orders 7 CCR 1103-1, 2 (Regular Rate of Pay).

**158:2-7, 158:7-17, 159:9-12**].

Under Rule 5.2 and Rule 8 of the applicable COMPS Orders and MWOs employers are required to provide,

> Rest Periods. Every employer shall authorize and permit a compensated 10-minute for each 4 hours of work, or major fractions thereof, for all employees. . .except as provided in exemptions or variances in Rule 2. . .

*See* COMPS Orders 36 (7 CCR 1103-1, 5.2); 37 (7 CCR 1103-1, 5.2); 38 (7 CCR 1103-1, 5.2); and MWOs 31 (7 CCR 1103-1, 8); 32 (7 CCR 1103-1, 8); 33 (7 CCR 1103-1, 8), 34 (7 CCR 1103-1, 8); and 35 (7 CCR 1103-1, 8).

Plaintiff claimed during her deposition that she was so busy, she never had time to take a 10-minute rest period (break), because she did not want to miss her place in the "que." [**Ex. 2, Pl.'s Dep. Tr. 163:17-19**].  Although Plaintiff testified that "[t]he policy was there were no rest breaks . . . There were no lunch breaks," Plaintiff could not identify any written Company policy that ***prevented*** her from taking a rest break or a meal break while she was employed at LGI Homes. [***Id.* at Pl.'s Dep. Tr. 224:18-25**]. Plaintiff testified that Connie Sonier [Vice President of HR] told her that she couldn't take a rest break, but upon further questioning, Plaintiff admitted that Ms. Sonier responded in writing to her wage claim demand letter in April 2023, approximately 2 months ***after*** she resigned from LGI Homes. [***Id.* at Pl.'s Dep. Tr. 225:8-10**]. This response letter set forth LGI Homes' position that Plaintiff was an exempt employee under the Outside Sales Exemption. [**Ex. 29, Sonier Dep. Ex. 10, MCALISTER_bates 0153**]. At her deposition, Plaintiff was only able to identify one instance of a manager telling her that she could not take a meal break-- Plaintiff wanted to go to Subway to get a sandwich, but according to Plaintiff, her sales manager told her that she could share her Subway sandwich. [**Ex. 2, Pl.'s Dep. Tr. 164:1-4**].

22

1.    *Plaintiff's personal calls at work.*

Contrary to Plaintiff's assertions that she never took a rest break while she worked at LGI Homes, her own Verizon cellphone records and calendar that she produced, betray her claims that she never took a rest break. [**Ex. 23, MCALISTER_Bates 004914-007395; MCALISTER_Bates0155-0546; Ex. 24, VERIZON 000001-001195; Ex. 2, Pl.'s Dep. Tr. 175-176:23-22; 176-177:25-6; 177-178:23-21; 179-182:2-3; Ex. Ex. 25, Pl.'s Dep. Ex. 26; Ex. 26, ¶ 23, Melinda Malyuk Decl.**]. At her deposition, LGI Homes counsel asked Plaintiff to identify the name that corresponds to the phone number on Plaintiff's Dep. Ex. #26. [**Ex. 2, Pl.'s Dep. Tr. 175-176:23-22; 176-177:25-6**] Plaintiff was able to identify 16 out of 23 of these cellphone numbers that were either family members, friends or businesses that she or her husband were doing personal business with. [**Pl.'s Dep. Ex. 26; Ex. 2, Pl.'s Dep. Tr. 177-178:23-21; 179-182:2-3**].

Her phone records indicate Plaintiff made personal calls totaling 75,064 minutes on  workdays that she allegedly worked. [**Ex. 24, VERIZON 000001-001195**]. This is the equivalent of 7,506 rest breaks received by Plaintiff during her employment at LGI Homes.[9] Moreover, the number of home tours that Plaintiff gave to customers show

---

[9] Even if Plaintiff was working 70-80 hours per week as she claims, her phone records demonstrate that she took rest breaks in excess of the statutory requirements for rest breaks. *See* COMPS Orders 36 (7 CCR 1103-1, 5.2); 37 (7 CCR 1103-1, 5.2); 38 (7 CCR 1103-1, 5.2); and MWOs 31 (7 CCR 1103-1, 8); 32 (7 CCR 1103-1, 8); 33 (7 CCR 1103-1, 8), 34 (7 CCR 1103-1, 8); and 35 (7 CCR 1103-1, 8)

Assuming, on the high end, Plaintiff worked 80 hours a week for the full statutory period, she would have worked 24,960 hours (80 hours x 6 years x 52 weeks) for LGI Homes and potentially would be eligible to 6,240 rest breaks.  Here, she made personal phone calls to 16 individuals that totaled the equivalent of 7,506 rest breaks. [**Ex. 26, ¶ 23, Melinda Malyuk Decl.; Ex. 27, Personal Calls Summary Chart**]

multiple weeks when she was giving 4 or less home tours per week, which would allow her plenty of time to take a 10-minute break for every 4 hours that she worked. [**Ex. 13, LGI HOMES 01066-01073**].

        2.    *Plaintiff's meal breaks at work.*

Plaintiff testified that she never had a lunch break at work, but she did admit to eating lunch at work and cooking meals in the sales office kitchen every day that she worked. [**Ex. 2, Pl.'s Dep. Tr. 157:5-7, 13-25; 158:2-7**]. Upon further questioning, Plaintiff clarified that she would cook "[t]wo times per week." [***Id.* at 158:7-17**]. Plaintiff also testified that it would take her 5-10 minutes to cook her lunch. [***Id.* at 159:9-12**].

        3.    *Plaintiff's remote work during COVID.*

During the COVID pandemic LGI Homes implemented a COVID protocol in Colorado from March 2020 to September 2020. [***Id.* at 169:22-25**]. During this protocol sales representatives were only scheduled to be in the sales office for four-hour shifts, instead of eight-hour shifts. [***Id.* at 171-172:19-13**]. Plaintiff would work remotely after her scheduled four-hour shift. [***Id.***]. Also, on Saturdays during the COVID protocol, sales representatives would only work from either 8:00 a.m. to noon, or 12:00 p.m. to 4:00 p.m. [***Id.* at 174:12-21**].

When considering this evidence, Plaintiff's claims that she was too busy to take a 10-minute rest period (break) are not supported by the facts obtained in discovery.

**D.**    **<u>Plaintiff's Execution of the Offer Letter Authorized LGI Homes to Deduct the Recoverable Draw from her Earned Commissions</u>**.

Plaintiff alleges that LGI Homes violated C.R.S. § 8-4-105 "by making deductions from the [Colorado Wage Act] Class Members' wages for 'draws,'" but this allegation is

not supported by the facts produced by the parties during discovery.

Colorado law authorizes payroll deductions for "loans or advances," pursuant to the following conditions:

(1) No employer shall make a deduction from the wages or compensation of any employee except as follows:

(b) Deductions for loans, ***advances***, goods or services, and equipment or property provided by an employer to an employee pursuant to a written agreement between such employer and employee, so long as it is enforceable and not in violation of law . . .

C.R.S. § 8-4-105(1)(b)[10] (Emphasis added.)

Under Colorado law, a draw is considered to be an "advance" and constitutes a wage. *Badger v. Nu-Tone Products Co.,* 425 P.2d 698, 700 (Colo. 1967) (regular advances are treated as salaries); 26 U.S.C. § 451(c)(1).

1.    *Plaintiff's offer letter is a binding contract.*

On December 2, 2015, Plaintiff received an offer letter from LGI Homes during an in-person interview that stated in part,

As a New Home Consultant your compensation will be comprised of several components:

2. After the training pay ends you will transfer to a Recoverable Draw of $1,384.62 per pay period ($9,000.00 per quarter) compared against commissions earned on a quarterly basis . . .

[**Ex. 2, Pl.'s Dep. Tr. 36:3-24; Ex. 6, Pl.'s Dep. Ex. 20, LGI HOMES 00806**].

Under Colorado law, an offer letter can be a binding contract if it is "clear, definite and explicit, and leaves nothing open for negotiation." *Watson v. Public Service Co. of*

---

[10] C.R.S. § 8-4-105(1)(b) the statutory language has not been amended from 2016-2023.

FP 51739897.6

*Colo.*, 207 P.3d 860, 868 (Colo. App. 2008) (*quoting Lefkowitz v. Great Minneapolis Surplus Store, Inc.*, 86 N.W.2d 689, 690-91 (Minn. 1957) ("The terms of the offer must be sufficiently definite that the promises of each party are reasonably certain.").

Plaintiff's offer letter was clear, definite, and explicit. *Id.* It set forth the terms of her employment: start date, mandatory training, compensation (including commission, recoverable draw, and bonus), vacation, medical coverage, 401k match, life insurance, short term, and long-term disability insurance. [**Ex. 6, LGI HOMES 00806**]. The offer letter also provided contact information for the Company's HR director if Plaintiff had any questions,

> . . . if you would like to receive more information on these requirements prior to the training class.

*Id.* The last paragraph of the offer letter states,

> By accepting this offer, you recognize that your employment is at will and this will be your compensation as long as you are employed unless revised by LGI.

*Id.* Finally, both the Plaintiff and LGI Homes signed the offer letter. *Id.*

According to the Plaintiff, she was interviewed by Lisa Brown and Kevin Wolf, LGI Homes sales managers. [**Ex. 2, Pl.'s Dep. Tr. 35:21-25**]. Plaintiff testified that she did not understand what a draw was and that she asked Lisa Brown, a sales manager, about the draw but did not get an answer. [**Ex. 2, Pl.'s Dep. Tr. 16:9-20, 23-25; 17:1-2, 5-16; 36:3-17; 30:1-21**]. However, Plaintiff acknowledged that the interview "was an all-day thing." [**Ex. 2, Pl.'s Dep. Tr. 36-37:18-3**]. Plaintiff also stated that she didn't understand what a "draw" was, and that she would not have accepted this job if she knew that she had to pay back the draw. [***Id.* at Pl.'s Dep. Tr. 37-38:23-7**].

26

Importantly, Plaintiff also admitted that she read the offer letter before signing it. [*Id.* **at Pl.'s Dep. Tr. 36:15-17**]. Under Colorado law, a party who signs a contract is generally presumed to have read and understood its contents, barring any instances of fraud. *Bell v. Land Title Guarantee Company,* 422 P.3d 613, 616 (Colo. App. 2018). Colorado cases have repeatedly held that one who signs or accepts a written contract, in the absence of fraud, is conclusively presumed to know its contents and to assent to them. *See Poly Trucking, Inc. v. Concentra Health Servs., Inc.*, 93 P.3d 561, 563 (Colo. App. 2004) ("[W]here a party's unilateral mistake is the result not of fraud, but of its own failure to use due diligence in reading the contract before signing it, that party will be held to the terms of the contract."); *see also Rasmussen v. Freehling*, 412 P.2d 217 (Colo. 1966) (same); *Kovacheff v. Langhart*, 343, 363 P.2d 702, 704 (Colo. 1961) (same); *Erickson v. Knights of the Maccabees of the World*, 203 P. 674, 675 (Colo. 1922) (same); *Cordillera Corp. v. Heard*, 592 P.2d 12 (Colo. App. 1978) (same). Here, Plaintiff has not asserted that she was fraudulently induced to the sign the offer letter, nor has she alleged that LGI Homes made a fraudulent misrepresentation of fact concerning the terms of the offer letter.

Moreover, Plaintiff testified that she had been a legal secretary at a law firm for 5 years prior to working for LGI Homes, and that "I knew how to write briefs . . . for a divorce; they may have been for an auto accident." [**Ex. 2, Pl.'s Dep. Tr. 12-13:13-6**]. The lawyers that she worked for told her that it was important to have correct documents that she was responsible for proofreading. [*Id.* **at Pl.'s Dep. Tr. 39:5-10**].

Despite her protestations that she didn't know what a "draw" is, Plaintiff signed the offer letter accepting the terms of the New Home Consultant position (establishing a

contract), which included the recoverable draw; as such, she is presumed to have understood its contents. [**Ex. 6, LGI HOMES 00806**]; *Bell*, 422 P.3d at 616.

> 2.   *Plaintiff's compensation, including the periods that she only received the draw never dropped below the federal minimum wage.*

Under the Colorado Wage Act Payroll Deductions Permitted-Notice statute, an authorized deduction cannot reduce an employee's pay below the "minimum wage applicable under the 'Fair Labor Standards Act of 1938', 29 U.S.C. sec. 201 et seq." *See* C.R.S. § 8-4-105(2). The federal minimum wage during Plaintiff's employment with LGI Homes was $7.25 per hour. 29 U.S.C. § 206(a)(1).

As noted above, Plaintiff's regular rate of hourly pay was at least one and one-half times the applicable minimum wage as set forth in either the applicable COMPS Orders or MWOs. [**Ex. 16, LGI Homes 1046-47**]. LGI Homes acknowledges that during 69 out of the 151 pay periods that Plaintiff received, the only compensation that Plaintiff received was the draw. However, during all 151 pay periods that Plaintiff worked, she received more than the federal minimum wage as required by the Payroll Deductions Permitted-Notice statute. *See* C.R.S. § 8-4-105(2).[11]

***Critically important, the draw that Plaintiff received is still compensation***. *See Badger*, 425 P.2d at 700. Even if Plaintiff was working 70-80 hours per week as she claims, the draw provided her compensation in excess of the federal minimum wage of $7.25 per hour.  When she was only receiving the draw, it equaled $1,384.62 gross per

---

[11] While the Company was not required to provide Plaintiff with earnings statement information under the COMPS Orders, LGI Homes issued itemized earning statements to Plaintiff during every pay period of her employment that included the "regular rates of pay, gross wages earned, withholdings made, and net amounts paid each pay period." [**Ex. 18, pay stubs**]; COMPS Orders 7-CCR 1103-1:7.2.

pay period (every two weeks), which is $692.31 per week, divided by 80 hours equates to $8.65 per hour, which is $1.40 over the federal minimum wage. [**Ex. 18, LGI HOMES 00839—01024**]. Ms. Sonier testified that if an employee was negative with respect to their draw, when they left LGI Homes, they would not have to pay the draw back. [**Ex. 3, Sonier, Dep. Tr. 75:12-16**].

Since Plaintiff's compensation never dropped below the federal minimum wage during her entire time that she was employed at LGI Homes, Plaintiff's claim that LGI Homes' recoverable draw violates the Colorado Wage Act fails as a matter of law and fact.

## III.    CONCLUSION

For the foregoing reasons, LGI Homes respectfully requests that the Court enter judgment pursuant to Fed. R. Civ. P. 56 on all of Plaintiff's claims for relief.

Respectfully submitted on August 5, 2024.

**FISHER & PHILLIPS LLP**

*/s/ Vance O. Knapp*
Vance O. Knapp
Patrick J. Collopy
1125 17th Street, Suite 2400
Denver, CO  80202
Tel: (303) 218-3650
Fax: (303) 218-3651
vknapp@fisherphillips.com
pcollopy@fisherphillips.com
*Counsel for Defendant LGI HOMES CORPORATE, LLC*

FP 51739897.6

**CERTIFICATE OF SERVICE**

I hereby certify that on this 5th day of August, 2024, I electronically filed the foregoing **DEFENDANT LGI HOMES CORPORATE, LLC'S MOTION FOR SUMMARY JUDGMENT PURSUANT TO FED. R. CIV. P. 56** with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following e-mail addresses:

Claire E. Hunter
Adam M. Harrison
Cynthia J. Sánchez
HKM Employment Attorneys LLP
518 17th Street, Suite 1100
Denver, CO 80202
(720) 255-0370
chunter@hkm.com
aharrison@hkm.com
csanchez@hkm.com

Jennifer A. Wadhwa
3i Law LLC
2000 S. Colorado Blvd.
Tower 1, Suite 10000
Denver, CO 80222
(303) 245-2100
jwadhwa@3ilawfirm.com

*Counsel for Plaintiff*

/s/ Monica Riley
For Fisher & Phillips LLP

FP 51739897.6