IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Nina Y. Wang

Civil Action No. 23-cv-03088-NYW-TPO

RIKKI MCALISTER, individually and on behalf of all others similarly situated,

      Plaintiff,

v.

LGI HOMES CORPORATE, LLC,

      Defendant.

---

## MEMORANDUM OPINION AND ORDER

---

This matter is before the Court on Defendant LGI Homes Corporate, LLC's Motion for Summary Judgment Pursuant to Fed. R. Civ. P. 56 (the "Motion" or "Motion for Summary Judgment").  [Doc. 51, filed August 5, 2024].[1]  The Court has reviewed the Motion and the related briefing, the applicable case law, and the record before the Court, and concludes that oral argument would not materially assist in the resolution of the Motion.  For the reasons set forth below, the Motion for Summary Judgment is respectfully **GRANTED in part** and **DENIED in part**.

### BACKGROUND

Plaintiff Rikki McAlister ("Plaintiff" or "Ms. McAlister") brings this class action lawsuit against her former employer, Defendant LGI Homes Corporate, LLC ("Defendant"

---

[1] Where the Court refers to the filings made in the Electronic Case Files ("ECF") system in this action, it uses the convention [Doc. __] and uses the page number as assigned by the ECF system, except when citing from a transcript.  When citing to a transcript, the Court uses the ECF docket number, but cites to the page and line numbers as assigned in the original transcript.

or "LGI").  *See* [Doc. 7].  Ms. McAlister broadly alleges that Defendant's pay and rest break policies for Ms. McAlister and its other sales representatives violate:  (1) the Colorado Wage Act ("CWA"), Colo. Rev. Stat. §§ 8-4-101 to -125 (2024); (2) the Colorado Minimum Wage Act ("CMWA"), Colo. Rev. Stat. §§ 8-6-101 to -120 (2024); and (3) the applicable regulation implementing the CWA and CMWA ("COMPS Order"), 7 Colo. Code Regs. § 1103-1 (2022).[2]  [Doc. 7 at 8–12].  The Court recently certified a class of all sales representatives who worked for Defendant in Colorado from May 23, 2017 to the present. *See* [Doc. 76 at 22].

Ms. McAlister asserts five claims in her First Amended Individual and Class Action Complaint ("Amended Complaint").  [Doc. 7].  Two claims allege that Defendant failed to pay sales representatives overtime compensation in violation of the CWA, CMWA, and COMPS Order ("Overtime Claims").  [*Id.* at ¶¶ 40–50, 65–70].  Two more claims allege that Defendant failed to provide its sales representatives with compensated rest breaks in violation of the CWA, CMWA, and COMPS Order ("Rest Breaks Claims").  [*Id.* at ¶¶ 51–56, 71–74].  The final claim asserts that Defendant violated the CWA by making improper deductions from sales representatives' paychecks ("Paycheck Deductions Claim").  [*Id.* at ¶¶ 57–64].  Defendant now seeks summary judgment on all claims.  *See* [Doc. 51].

---

[2] Several versions of the COMPS Order applied during Ms. McAlister's employment. Because the Parties identify no relevant differences between any versions of these orders, the Court cites to the most recent applicable version—COMPS Order #38—unless otherwise specified.  *See* 7 Colo. Code Regs. § 1103-1 (2022).  For clarity when citing to the COMPS Order, the Court refers only to the sections within the COMPS Order and omits the Colorado Code of Regulations citation information.  For instance, the Court cites to Rule 8.1 of COMPS Order #38 as COMPS Order § 8.1 rather than 7 Colo. Code Regs. § 1103-1-8.1.

Plaintiff has responded in opposition, [Doc. 64], and Defendant has replied, [Doc. 73]. The Court considers the Parties' arguments below.

## LEGAL STANDARD

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine if there is sufficient evidence so that a rational trier of fact could resolve the issue either way. A fact is material if under the substantive law it is essential to the proper disposition of the claim." *Crowe v. ADT Sec. Servs., Inc.*, 649 F.3d 1189, 1194 (10th Cir. 2011) (citation and quotations omitted).

To satisfy its burden at summary judgment, the nonmovant must point to competent summary judgment evidence creating a genuine dispute of material fact; conclusory statements based on speculation, conjecture, or subjective belief are insufficient. *See Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004). When a defendant seeks summary judgment based on an affirmative defense, the plaintiff "need only identify a disputed material fact relative to the affirmative defense" to defeat the motion for summary judgment. *Hamric v. Wilderness Expeditions, Inc.*, 6 F.4th 1108, 1122 (10th Cir. 2021); *see also Leone v. Owsley*, 810 F.3d 1149, 1153 (10th Cir. 2015). In considering the evidence in the record, the Court cannot and does not weigh the evidence or determine the credibility of witnesses. *See Fogarty v. Gallegos*, 523 F.3d 1147, 1165 (10th Cir. 2008). At all times, the Court views the record in the light most favorable to the nonmoving party. *Banner Bank v. First Am. Title Ins. Co.*, 916 F.3d 1323, 1326 (10th Cir. 2019).

## UNDISPUTED MATERIAL FACTS

The following material facts are drawn from the summary judgment record and are undisputed unless otherwise noted.

1.      LGI is a residential home builder that sells homes in Colorado and several other states.  [Doc. 51 at ¶ 1; Doc. 64 at 5 ¶ 1; Doc. 51-1].

2.      From 2018 to 2023, retail sales made up at least 85% of LGI's annual dollar volume.  [Doc. 51 at ¶ 2; Doc. 64 at 5 ¶ 2; Doc. 73 at 2 ¶ 2; Doc. 64-15].

3.      LGI is headquartered in Texas.  [Doc. 56 at ¶ 3; Doc. 64 at 5 ¶ 3; Doc. 40-1 at ¶ 13].

4.      LGI pays its sales representatives on a commission basis with a "Recoverable Draw" and awards "volume bonuses" based on the number of homes closed each year.  [Doc. 51 at ¶¶ 6–7; Doc. 64 at 6 ¶¶ 6–7; Doc. 51-3 at 33:17–34:24; Doc. 64-14].

5.      LGI does not require sales representatives to pay back outstanding "Recoverable Draw" amounts when their employment ends.  [Doc. 51 at ¶ 49; Doc. 64 at 10 ¶ 49].[3]

6.      LGI does not pay sales representatives overtime pay.  [Doc. 64 at 3 ¶ 4; Doc. 73 at 11 ¶ 4; Doc. 64-3 at ¶ 11; Doc. 64-8].

_____

[3] Defendant supports this fact with a citation to deposition pages that do not exist in the record.  *See* [Doc. 51 at ¶ 49].  Nevertheless, Plaintiff admits that LGI does not require sales representatives to repay outstanding Recoverable Draw amounts when their employment ends, [Doc. 64 at 10 ¶ 49], and there is no evidence in the record to suggest otherwise.  The Court therefore treats this fact as undisputed for purposes of the Motion. Fed. R. Civ. P. 56(e)(2).

7.    Plaintiff worked for LGI as a sales representative from January 2016 to February 2023.  [Doc. 51 at ¶ 31; Doc. 64 at 8 ¶ 31; Doc. 51–2 at 16:2–4, 209:23–25].

8.    Plaintiff received an offer letter ("Offer Letter") from LGI that defined her compensation, aside from her training pay, as

> a Recoverable Draw of $1,384.62 per pay period ($9,000 per quarter) compared against commissions earned on a quarterly basis.  The maximum deficit allowed is $12,000.00.  If you exceed the $12,000.00 maximum deficit, you no longer receive the recoverable draw but you will be paid on the first 2 units closed each month.  All units closed above the first 2 will reduce your draw deficit.  Any bonus will go towards deficit.

[Doc. 51 at ¶ 23; Doc. 64 at 7 ¶ 23; Doc. 64-14].[4]

9.    During one of her interviews for the sales representative position, Plaintiff asked an LGI sales manager about the Recoverable Draw but did not receive an answer.  [Doc. 51 at ¶¶ 46–48; Doc. 64 at 10 ¶¶ 46–48; Doc. 64-5 at 16:23–17:16, 30:1–32:7].

10.    Plaintiff read and signed the Offer Letter after those interviews.  [Doc. 51 at ¶¶ 24, 26; Doc. 64 at 7 ¶¶ 24, 26; Doc. 64-14].

11.    Aside from her initial training at LGI headquarters, Plaintiff worked either from her home or at LGI sales offices in Colorado.  [Doc. 51 at ¶¶ 27, 32, 62–64; Doc. 64 at 8 ¶¶ 27, 32; *id.* at 12 ¶¶ 62–64; Doc. 64-3 at ¶ 4; Doc. 74-1 at 171:19–172:24].

12.    An LGI sales office is a temporary office set up in an unsold residential home in an LGI development.  [Doc. 51 at ¶ 9; Doc. 64 at 6 ¶ 9; Doc. 51-3 at 26:3–27:14].

13.    Sales representatives perform most of their job duties from sales offices, including reviewing client leads, calling potential clients, receiving clients, checking client

---

[4] Ms. McAlister argues that Defendant never explained the "recoverable draw" but does not dispute the Offer Letter or its description of her compensation structure.  [Doc. 64 at 7 ¶ 23].  The Court therefore considers this fact undisputed.  *See* Fed. R. Civ. P. 56(e).

credit scores, and completing closing documents.  [Doc. 51 at ¶¶ 9–10; Doc. 64 at 6 ¶¶ 9–10; Doc. 51-3 at 26:14–27:9; Doc. 51-4 at 58:12–59:18; Doc. 64-7 at ¶¶ 11–13].

14.    Sales representatives would leave the sales office to lead clients on home tours.  [Doc. 51 at ¶¶ 11, 33(e); Doc. 64 at 6 ¶ 11; Doc. 64-7 at ¶ 13. Doc. 74-1 at 140:2–24]

15.    Plaintiff performed all of the above-listed duties during her time as a sales representative.  [Doc. 51 at ¶ 33; Doc. 64 at 8 ¶ 33; Doc. 74-1 at 166:10–168:13].

16.    During Plaintiff's time as a sales representative, aside from her training, Defendant paid Plaintiff no less than the Recoverable Draw of $1,384.62 each pay period.[5]  *See* [Doc. 51 at ¶ 42; Doc. 64 at 9 ¶ 42; Doc. 51-18].

17.    Some pay periods, Defendant paid Plaintiff commissions or volume bonuses in addition to the Recoverable Draw.  *See, e.g.*, [Doc. 51 at ¶¶ 42, 44; Doc. 64 at 9 ¶ 42, 10 ¶ 44; Doc. 51-18 at 32–33, 101, 133].

18.    LGI deducted pay from Plaintiff's commission earnings based on the Recoverable Draw.[6]  [Doc. 51 at ¶¶ 41–42; Doc. 64 at 9 ¶¶ 41–42]; *see also* [Doc. 51-3 at 34:10–34].

---

[5] For five pay periods in 2019, Defendant paid Plaintiff commissions and either a reduced Recoverable Draw or no Recoverable Draw at all.  *See, e.g.*, [Doc. 51-18 at 81–85]. Because of this, Plaintiff received less than $36,000 in Recoverable Draw in 2019.  [Doc. 51-17 at 13].  Neither Party explains the discrepancy.  The Court does not deem these isolated paystubs significant to its analysis, however, because Plaintiff's total monthly pay never fell below the draw amount.  The Court therefore uses Plaintiff's Recoverable Draw payments as a baseline in calculating her eligibility for the CWA and COMPS Order exemptions discussed below.

[6] Although Plaintiff contends that the precise amount of Defendant's deductions from her commissions were "unknown and undisclosed," she does not dispute that LGI deducted pay from her commissions as contemplated by her Offer Letter.  [Doc. 64 at 9 ¶ 42].  Her arguments even assume that LGI deducted the Recoverable Draw amounts from later commissions such that the Recoverable Draw was not a wage at all.  [*Id.* at 22–23 & nn.

## ANALYSIS

The Court diverges from the order in which Plaintiff's claims are presented in the Amended Complaint and the Motion,[7] and starts its analysis with the Paycheck Deductions Claim, in order to decide the threshold question of whether Plaintiff's Recoverable Draw payments were a lawful "wage" for purposes of federal and Colorado law.  *See* [Doc. 64 at 22–23, 23 n.55]; *see also infra* Part I.C.

## I.    Paycheck Deductions

Defendant argues that Plaintiff's Paycheck Deductions Claim fails because LGI's draw-against-commission compensation structure complies with the CWA.  [Doc. 51 at 24–29].  The CWA generally prohibits an employer from "mak[ing] a deduction from the wages or compensation of an employee."  Colo. Rev. Stat. § 8-4-105(1).  Deductions are permissible, however, when made for "loans, advances, goods or services, and equipment or property provided by an employer to an employee pursuant to a written agreement between such employer and employee, so long as it is enforceable and not in violation of law."  § 8-4-105(1)(b).  But even if the employer and employee contracted for the deduction, the CWA does not authorize a deduction below the federal minimum wage.  § 8-4-105(2).  There is no dispute between the Parties that the commissions paid to Ms. McAlister for selling LGI homes constitute wages or compensation of an employee.  *See*

---

55, 57].  And the Court cannot credit her conclusory denial that she was paid on "commission, less a recoverable draw" merely because the Offer Letter and other documents do not use that precise phrasing.  [*Id.* at 9 ¶ 41]; *see Pasternak v. Lear Petroleum Expl., Inc.*, 790 F.2d 828, 834 (10th Cir. 1986) ("Conclusory allegations, general denials, or mere argument of an opposing party's case cannot be utilized to avoid summary judgment.").  The Court deems this fact undisputed.  Fed. R. Civ. P. 56(e)(2).

[7] *See* [Doc. 7 at 10 (labeling paycheck deductions as Plaintiff's third claim for relief); Doc. 51 at 24 (addressing Paycheck Deductions claim last)].

*generally* [Doc. 51; Doc. 64; Doc. 73]; *see also* Colo. Rev. Stat. § 8-4-101(14)(a)(I)–(II) ("wages" includes "[b]onuses or commissions earned for labor or services performed in accordance with the terms of any agreement between an employer and employee"). Then, to determine whether the CWA permits paycheck deductions for quarterly Recoverable Draws, the Court considers (1) whether the Recoverable Draw constitutes an "advance"; (2) whether the Offer Letter is an enforceable agreement; and (3) whether the deductions decreased Plaintiff's pay below the federal minimum wage.

### A. Advance

LGI argues that the Recoverable Draw qualifies as an "advance" on future commissions that falls within the ambit of § 8-4-105(1)(b). *See* [Doc. 51 at 25; Doc. 51-3 at 34:10–21]. Ms. McAlister disagrees. [Doc. 64 at 23 n.57, 33]. When interpreting the meaning of "advance" as used in the Colorado Wage Act, this Court seeks to ascertain and give effect to the intent of the Colorado General Assembly. *Kouzmanoff v. Unum Life Ins. Co. of Am.*, 374 F. Supp. 3d 1076, 1087 (D. Colo. 2019) (citing *Walker v. People*, 932 P.2d 303, 309 (Colo. 1997); *Farmers Ins. Exch. v. Bill Boom, Inc.*, 961 P.2d 465, 469 (Colo. 1998)). To determine that intent, the Court first considers the plain language of the statute, giving effect to the ordinary meaning of words used. *Id.*

Although the CWA does not define "advance," Black's Law Dictionary defines an advance as "[t]he furnishing of money . . . before any consideration is received in return." *Advance*, Black's Law Dictionary (12th ed. 2024); *see also Advance*, Merriam Webster, https://www.merriam-webster.com/dictionary/advance (last visited March 17, 2025) ("a provision of [money] before a return is received"); *Veith v. Colorado*, 390 P.3d 403, 406–07 (Colo. 2017) ("When a word is not defined by statute, we construe it in accordance

with its ordinary meaning.").[8]  LGI's commission-based compensation structure makes clear that the relevant "consideration" is home sales and their attendant commissions. *See* [Doc. 64-14 at 2 (providing that LGI will not pay the Recoverable Draw if an employee generates so few sales commissions that she accrues a $12,000 "deficit" of unrecovered draws)]; *cf. Osorio v. Tile Shop, LLC*, No. 15-cv-00015-MFK, 2018 WL 1453552, at *5 (N.D. Ill. Mar. 23, 2018) (defining "cash advance" for sales employees under similar pay structure as "an advance on the employee's commissions for sales not yet made" for purposes of Illinois's wage statute), *aff'd on other grounds*, 939 F.3d 847 (7th Cir. 2019). And unlike *Osorio*, LGI caps payment of Recoverable Draws and conditions future pay on "the first two units closed each month," inextricably tying the Recoverable Draw to the consideration of home sales and the resulting commissions.  [Doc. 64-14 at 2]. *Cf. Osorio*, 2018 WL 1453552, at *5 (finding that a recoverable draw was not an advance because employer did not always require repayment).[9]

The totality of the circumstances presented here thus reflects that LGI's Recoverable Draw advances commission pay to sales representatives before they return the consideration of completing home sales, and in turn, earning commissions on those sales.  *See* 29 C.F.R. § 779.416(a) (2024) (advising that pay structures like LGI's may be described as "advances," "draws," or "guarantees" and should be treated as

---

[8] This Court notes that although Ms. McAlister urges the Court not to define "advance" broadly in Defendant's favor, she offers no specific definition of "advance." [Doc. 64 at 33].  Nor does she explain how the Recoverable Draw is not an advance against future work and yet-to-be-earned commissions.

[9] In any case, this Court is not bound by *Osorio*, an out-of-Circuit district court case.  *See United States v. Rhodes*, 834 F. App'x 457, 462 (10th Cir. 2020) ("[D]istrict courts in this circuit are bound by [Tenth Circuit] decisions and those of the United States Supreme Court—they are not bound by decisions of other district courts.").

"represent[ing] commissions" so long as the draw "actually functions as an integral part of a true commission basis of payment").

Accordingly, the Court concludes that the recoverable draw is an advance that qualifies for the exception in § 8-4-105(1)(b).

## B.    Enforceable Agreement

Plaintiff argues that the Offer Letter is not an enforceable agreement because she never assented to its terms.  [Doc. 64 at 31–34].  An enforceable contract requires mutual assent and consideration.  *See Indus. Prods. Int'l, Inc. v. Emo Transp., Inc.*, 962 P.2d 983, 988 (Colo. App. 1997) (citing *Denver Truck Exch. v. Perryman*, 307 P.2d 805 (Colo. 1957)).  Mutual assent entails a "meeting of the minds" in which the parties agree to "sufficiently definite and certain terms."  *Univ. of Denver v. Doe*, 547 P.3d 1129, 1139 (Colo. 2024) (quotation omitted).  "The requisite meeting of the minds is established by the parties' acts, conduct, and words, along with the attendant circumstances, and not by any subjective, unexpressed intent by either party."  *French v. Centura Health Corp.*, 509 P.3d 443, 449 (Colo. 2022).  When a contract term is ambiguous, such that the parties "ascribe different meanings to a material term of a contract, the parties have not manifested mutual assent, no meeting of the minds has occurred, and there is no valid contract."  *Id.* (quotation omitted); *accord Univ. of Denver*, 547 P.3d at 1139–40.

While the existence of a contract is a question of fact, *Tuscany Custom Homes, LLC v. Westover*, 490 P.3d 1039, 1049 (Colo. App. 2020), "[w]hether a written contract is ambiguous is a question of law," *E. Ridge of Fort Collins v. Larimer & Weld Irrigation Co.*, 109 P.3d 969, 974 (Colo. 2005).  Mindful of this distinction at the summary judgment stage, the Court first considers whether the Offer Letter is ambiguous, then turns to

whether there is a genuine issue of fact that Ms. McAlister manifested her assent to the Offer Letter's terms. *See I.M.A., Inc. v. Rocky Mountain Airways*, 713 P.2d 882, 887 (Colo. 1986) ("[W]hen . . . the evidence is conflicting or admits of more than one inference, it is for the jury to decide whether a contract in fact exists.").

"[A] contract is ambiguous if it is fairly susceptible to more than one interpretation." *E. Ridge of Fort Collins*, 109 P.3d at 974 (quotation omitted). Ordinarily, "when a contract term is undefined, a court should look to the plain meaning of the language to ascertain whether there is ambiguity." *Ringquist v. Wall Custom Homes, LLC*, 176 P.3d 846, 849–50 (Colo App. 2007). But "when parties are engaged in a trade or technical field, unless a different intention is manifested[,] technical terms and words of art are given their technical meaning when used in a transaction within their technical field." *Colorado ex rel. Rein v. Jacobs*, 465 P.3d 1, 11 (Colo. 2009) (cleaned up). The Court's aim in construing a contract is to give effect to the parties' intent, so "written contracts that are complete and free from ambiguity will be found to express the intention of the parties and will be enforced according to their plain language." *USI Props. E., Inc. v. Simpson*, 938 P.2d 168, 173 (Colo. 1997).

The Offer Letter uses the term "recoverable draw" as a technical term to refer to a particular compensation structure for salespersons. *See* [Doc. 64-14 at 2]. Ms. McAlister's pay structure is described as "a Recoverable Draw of $1,384.62 per pay period ($9,000.00 per quarter) compared against commissions earned on a quarterly basis." [*Id.*]. This description aligns with the meaning of "recoverable draw" in the sales field:

> Another alternative [pay structure] is to provide a "recoverable" draw pursuant to which the salesperson is paid an agreed fixed amount of money

> (the "draw amount") for a specific time period, such as a month, and that amount is then compared to the commission that the salesperson is entitled to for that period based on his or her sales activities. If the commission amount exceeds the draw amount the salesperson would receive the difference within a specified period after the end of the month. On the other hand, if the commission amount is less than the draw amount the company would have the right to recover the difference in a manner agreed upon by the parties.

Alan S. Guttman, *Bus. Transactions Sols.* § 359:24 (Mar. 2025 update). LGI's vice president of human resources expressed a similar understanding of the recoverable draw, explaining that sales representatives receive the draw each pay period but only earn commissions after their commissions exceed the quarterly draw amount. [Doc. 51-3 at 13:12–17, 34:13–21].

Plaintiff does not explain why "Recoverable Draw" should not be given its usual technical meaning. She suggests that the term is ambiguous because it is not defined in the Offer Letter or any other document. [Doc. 64 at 33]. But a term is not ambiguous merely because the contract does not define it. To demonstrate ambiguity, Plaintiff must point to some other reasonable interpretation of "Recoverable Draw." *E. Ridge of Fort Collins*, 109 P.3d at 974. She provides none. Instead, Ms. McAlister merely disagrees with the meaning of the term without any evidence or authority in support of her position. *See Rein*, 465 P.3d at 12 (holding that disagreement alone is insufficient to establish ambiguity or convince the court not to apply the "generally accepted meaning" of a technical term). The Court therefore accords "Recoverable Draw" its standard technical meaning and finds that the Offer Letter unambiguously authorizes LGI to recover the draw amounts on a quarterly basis by deducting them from Plaintiff's commissions.

The Court is further respectfully unpersuaded by Plaintiff's argument that she did not effectively assent to the Offer Letter. [Doc. 64 at 33–34]. Ms. McAlister contends that

because she did not understand the meaning of "Recoverable Draw," there was no "meeting of the minds" to form the contract.  [*Id.*].  That misstates the meaning of "meeting of the minds," a term that refers to the mutual assent requirement and is judged by the parties' objective "acts, conduct, and words."  *French*, 509 P.3d 449.  Even viewing Ms. McAlister's conduct in the light most favorable to her, she plainly manifested her assent to the Offer Letter.  After the LGI manager interviewing Ms. McAlister did not answer her question about the recoverable draw, Ms. McAlister still signed the Offer Letter.  [Doc. 64-5 at 31:15–32:7].

Signing a contract is the paradigmatic manifestation of assent.  *Cf. Rasmussen v. Freehling*, 412 P.2d 217, 219 (Colo. 1966) ("[T]he rule of the sanctity of written documents . . . dictates that persons privy to such agreements are bound by their terms; that if one signs a contract without reading it he is barred by his negligence from claiming he is not bound by what he has signed.").  The fact that Ms. McAlister subjectively did not understand the recoverable draw after her discussion (or lack thereof) with the LGI manager does not defeat her clear and intentional expression of assent.  *See Peterson v. USAA Life Ins. Co.*, 353 F. Supp. 3d 1099, 1109 (D. Colo. 2018) ("[Colorado] law charges a party to a contract with knowledge of its contents." (ellipsis and quotation omitted)); Restatement (Second) of Contracts § 19 cmt. c (Am. L. Inst. 1981, Oct. 2024 update) (explaining that a party's conduct amounts to assent when there is "intentional or negligent creation of an appearance of assent").  Indeed, to the extent that she did not understand the meaning or consequence of the term "Recoverable Draw," *see* [Doc. 51 at ¶¶ 46, 48; Doc. 64 at 10 ¶¶ 46, 48; Doc. 74-1 at 16:23–17:16, 30:1–25], she was well aware of that at the time she executed the Offer Letter on December 5, 2015, [Doc. 64-

14]. It is well-settled that what Ms. McAlister understood or contemplated is not relevant; a unilateral mistake is not a ground for setting aside an agreement when there is no other evidence of any action LGI took to mislead her or any mutual mistake. *See Royal v. Colo. State Pers. Bd.*, 690 P.2d 253, 255 (Colo. App. 1984).

The Court concludes that there is no genuine factual issue as to whether Ms. McAlister objectively manifested assent to the Offer Letter's unambiguous terms. The Offer Letter is therefore "enforceable" and authorizes paycheck deductions under § 8-4-105 so long as the agreement does not violate the federal minimum wage requirements.

### C. Minimum Wage

The CWA does not authorize paycheck deductions below the federal minimum wage. § 8-4-105(2). Under the Fair Labor Standards Act ("FLSA"), the current federal minimum wage is $7.25 an hour. 29 U.S.C. § 206(a)(1)(c). Plaintiff's paystubs show that she never received less than the recoverable draw amount of $1,384.62 for each two-week pay period. [Doc. 51-18]; *see also supra* note 5. Even crediting Plaintiff's assertions that she worked as many 75 hours per week—150 hours in a two-week pay period, [Doc. 64 at ¶ 57]—the recoverable draw places Plaintiff above the federal minimum wage. Calculating Plaintiff's pay as $1,384.62 divided by 150 hours yields an hourly rate of $9.23. That complies with the FLSA and, by extension, § 8-4-105(2) of the CWA.

Plaintiff nevertheless argues that the Recoverable Draw cannot be used to determine whether LGI's pay structure complies with FLSA because the draw is not a paid "wage" in the first place. [Doc. 64 at 22–23 & nn. 55, 57; *id.* at 34–35]. Plaintiff cites a federal regulation that states:

> "[W]ages" cannot be considered to have been paid by the employer and received by the employee unless they are paid finally and unconditionally

or "free and clear." The wage requirements of the [FLSA] will not be met where the employee "kicks-back" directly or indirectly to the employer or to another person for the employer's benefit the whole or part of the wage delivered to the employee.

29 C.F.R. § 531.35 (2024); *see also* [Doc. 64 at 33 & n.103]. This resembles the CWA's definition for "wages," which requires that a payment be "earned, *vested*, and determinable" to qualify as wages. § 8-4-101(14)(a)(I) (emphasis added). The Court discerns no relevant difference between "vested" and "free and clear" as used in the FLSA regulations. *See Vested*, Black's Law Dictionary (12th ed. 2024) ("Having become a completed, consummated right for present or future enjoyment; not contingent; unconditional; absolute"). In other words, if a payment is "free and clear," it must also be "vested" wages for CWA purposes and can be used to calculate whether an employee's pay satisfies the FLSA's minimum wage requirements. The Court thus considers these two terms in tandem.[10]

Plaintiff contends that, for pay periods where she only received the Recoverable Draw, Defendant retroactively reduced her pay to zero by deducting the Recoverable Draw amount from later commissions. [Doc. 64 at 34]. She reasons that these deductions mean the draw was neither a "free and clear" wage nor above the minimum wage, because the deductions reduced her hourly pay to zero. [*Id.*].

The Parties cite no authority from Colorado courts, the Tenth Circuit, or the District of Colorado that has have taken up this precise issue—nor did this Court independently find any. But the Sixth Circuit rejected Plaintiff's argument when faced with nearly

---

[10] The Court's reasoning that "free and clear" and "vested" are logically related should not be taken as a conclusion that the CWA's deductions provision, Colo. Rev. Stat. § 8-4-105, is identical to or "closely patterned after" the free and clear regulation, *see Gomez v. JP Trucking, Inc.*, 509 P.3d 429, 440 (Colo. 2022).

identical facts.  *See Stein v. HHGREGG, Inc.*, 873 F.3d 523, 530–34 (6th Cir. 2017).  In *Stein*, the sales employees received a draw for weeks when their earned commissions fell below the minimum wage.  *Id.* at 526.  The employees were required to repay the draw, "typically by deducting the amount of the 'draw' from commissions earned during the very next week," so long as the post-deduction commissions exceeded the minimum wage.  *Id.* at 526–27 (ellipses omitted).  Employees sued, alleging the deductions from commission earnings violated the "free and clear" regulation.  *Id.* at 530.  The Sixth Circuit disagreed.  While it would be unlawful for an employer to require an employee to "kick back" wages already "delivered to the employee," the employer's system entitled employees to keep the full amount of a draw that is "paid and 'delivered.'"  *Id.* at 531 (quoting 29 C.F.R. § 531.35).  Instead, the deductions were "made from wages *not* delivered, that is, from future earned commissions that have not yet been paid."  *Id.* Surveying numerous Department of Labor ("DOL") interpretive documents, the Sixth Circuit found that DOL has long viewed an employer's "practice of crediting draws against future earnings as permissible under the FLSA, so long as the employer does not deduct from wages *already paid*."  *Id.* at 532–34.  Because the employer only deducted the draw amounts from commissions, the Sixth Circuit concluded that the draws themselves were delivered "free and clear" and did not violate the regulation.[11]

The Court finds *Stein* persuasive.  LGI only deducted a sales representative's Recoverable Draw amount from future commissions.  [Doc. 51-3 at 34:13–21; Doc. 65-

---

[11] The Sixth Circuit found that an employer would violate the "free and clear" regulation by requiring—either through written policy or in practice—an employee to repay outstanding draw amounts upon termination.  *Stein*, 873 F.3d at 534–36.  But the Parties here agree that LGI did not require repayment of a draw "deficit" when a sales representative left the company.  *See* UMF at ¶ 5.

14].  It did not require sales representatives to repay previously paid Recoverable Draws under any other circumstances.  *See* [Doc. 51 at ¶ 49; Doc. 64 at 10 ¶ 49].  Once a sales representative receives a Recoverable Draw payment, the payment is a final, unconditional, and "free and clear" advance payment of her forthcoming commissions; the timing of the payment does not impact its nature.  The Court concurs with the Sixth Circuit and the DOL that this pay structure does not affect an employee's "delivered" wages and therefore complies with 29 C.F.R. § 531.35.  And because a delivered draw payment was complete and unconditional, the Court finds that Plaintiff's draw payments were vested "wages" under the CWA.  Colo. Rev. Stat. § 8-4-101(14)(a)(I); *cf. Badger v. Nu-Tone Prods. Co.*, 425 P.2d 698, 700 (Colo. 1967) (recognizing that, under traditional agency principles, regular advances on commissions are "in the nature of salary or wages," and "recoverable" only from subsequent commissions unless the parties expressly agree otherwise).  The Court thus concludes that LGI's draw-against-commission pay structure was lawful because it delivered "free and clear" wages that exceeded the federal minimum wage.[12]  29 C.F.R. § 531.35; Colo. Rev. Stat. § 8-4-105(2).

Accordingly, LGI's deductions from Plaintiff's commission payments were permissible under the CWA, *see* § 8-4-105, and Plaintiff's Paycheck Deductions Claim fails.  Because no genuine factual issues remain as to the lawfulness of the deductions, the Motion is respectfully **GRANTED** with respect to Plaintiff's Paycheck Deductions Claim.  The Paycheck Deductions Claim is **DISMISSED with prejudice**.

---

[12] For this same reason, the Court respectfully rejects Plaintiff's argument that the Offer Letter cannot authorize deductions under § 8-4-105(1)(b) because it violates the law. [Doc. 65 at 34].

## II.     COMPS Order Exemptions

Defendant next asks the Court to rule that Plaintiff and other sales representatives are covered by two COMPS Order exemptions:  the Outside Salespersons exemption and the Commission Sales exemption.  [Doc. 51 at 13–21]; *see also* COMPS Order §§ 2.2.4, 2.4.2.  The Court construes the COMPS Order, an administrative regulation, using the "same rules of construction that [courts] would apply in interpreting a statute." *Brunson v. Colo. Cab Co.*, 433 P.3d 93, 96 (Colo. App. 2018).  The Court's "foremost goal" in interpreting the COMPS Order is to "give effect to the promulgating body's intent"—here, the intent of the Colorado Division of Labor and Employment ("CDLE"). *See Gomez v. JP Trucking, Inc.*, 509 P.3d 429, 436 (Colo. 2022).  If the regulation's language is unambiguous, the Court "enforce[s] it as written, giving the words and phrases their common and ordinary meaning."  *Id.*  But if the regulation is ambiguous, the Court "may resort to other interpretative aids to discern the drafters' intent."  *Id.*  In interpreting the COMPS Order, the Court remains mindful that its exemptions should be construed narrowly.  *Brunson*, 433 P.3d at 97; COMPS Order § 8.7(A).

### A.     Outside Salespersons Exemption

Defendant first argues that Plaintiff's Overtime Claims and Rest Breaks Claims are barred by the COMPS Order's "Outside Salespersons" exemption.  [Doc. 51 at 13–19]. The Outside Salespersons exemption covers

> an employee working primarily away from the employer's place of business or enterprise for the purpose of making sales or obtaining orders or contracts for any commodities, articles, goods, real estate, wares, merchandise, or services.  The employee must spend a minimum of 80% of the workweek in activities directly related to his or her own outside sales.

COMPS Order § 2.2.4.  The Parties do not dispute that Plaintiff "primarily" worked from LGI's sales offices.  [Doc. 51 at ¶¶ 9–10; Doc. 64 at 6 ¶¶ 9–10; Doc. 64-7 at ¶¶ 11–13]. Instead, Defendant contends that the phrase "employer's place of business or enterprise" should be read to refer to an employer's corporate headquarters or "principal place of business."  [Doc. 51 at 15–17].

Defendant's reading defies the plain language of the Outside Salespersons exemption.  "Place of business" and "enterprise" are not restrictive terms.  *See Place of Business*, Black's Law Dictionary (12th ed. 2024) ("A location at which one carries on a business"); *Enterprise*, Black's Law Dictionary (12th ed. 2024) ("An organization or venture, esp. for business purposes" or "[o]ne or more persons or organizations that have related activities, unified operation or common control, and a common business purpose").  When LGI locates a sales office in an unsold home, stations sales representatives there, and directs them to conduct business on its behalf, that sales office is plainly a "place of business" and part of LGI's "enterprise."  Defendant offers various reasons for why these terms might be ambiguous but never bridges the gap to explain why "place of business" should be read as "principal place of business."  *See* [Doc. 51 at 15–17].  That reading improperly adds the term "principal" to the Outside Salespersons exemption.  *See Brennan v. Broadmoor Hotel Inc.*, 535 P.3d 1016, 1023 (Colo. App. 2023) ("[Courts] must respect the promulgating body's choice of language and not add or subtract words." (citing *Dep't of Revenue v. Agilent Techs., Inc.*, 441 P.3d 1012, 1016 (Colo. 2019))).  Defendant also inverts a guiding principle of interpreting the CWA and the COMPS Order—courts construe protections broadly and exemptions narrowly, not the other way around.  *Id.* (rejecting interpretation that would read the COMPS Order's

"coverage narrowly and its exemptions broadly"). For these reasons, the Court respectfully rejects the notion that an employee is away from her employer's "place of business" anytime she exits the corporate headquarters. And because Defendant fails to show that no genuine factual issues persist as to whether the Outside Salespersons exemption applies to Plaintiff, the Motion is **DENIED** with respect to this exemption.

### B.   Commission Sales Exemption

Defendant next argues that Plaintiff's Overtime Claims are partially barred by the COMPS Order's Commission Sales exemption. [Doc. 51 at 19–21]. The Commission Sales exemption provides that the COMPS Order's overtime pay requirements do not apply to:

> Sales employees of retail or service industries paid on a commission basis, provided that at least 50% of their total earnings in the pay period is derived from commission sales, and their regular rate of pay is at least one and one-half times the minimum wage, are exempt from Rule 4 (Overtime). This exemption is applicable for only employees of retail or service employers who receive over 75% of their annual dollar volume from retail or service sales.

COMPS Order § 2.4.2. Plaintiff responds that Defendant cannot invoke the Commission Sales exemption because (1) Defendant waived this exemption by failing to raise it in the Answer and (2) the Commission Sales exemption does not apply to Ms. McAlister. [Doc. 64 at 20–24].

### 1.   Waiver

Plaintiff first argues that the Court need not reach the merits of Defendant's Commission Sales exemption argument because Defendant waived this defense by failing to raise it in the Answer. [*Id.* at 20–21]; *see also* [Doc. 8]. Defendant replies that it raised the Commission Sales exemption defense in the Answer by stating

Without admitting liability for any acts or omissions alleged, any act or omissions complained of were undertaken or made in good faith, and/or in conformity with, and in reliance on, *written administrative regulations*, order, ruling, or interpretations of the Administrator of the Wage and Hour Division of the U.S. Department of Labor and the Executive Director of the Colorado Department of Labor and Employment.

[Doc. 73 at 13–14; Doc. 8 at 19 (emphasis added)].  Defendant reasons that because affirmative defenses face a relatively low pleading standard, the Answer's indirect reference to the COMPS Order sufficiently asserts the Commission Sales exemption as an affirmative defense.  [Doc. 73 at 13 & n.45]; *see also, e.g.*, *Alarid v. Biomet, Inc.*, No. 12-cv-02667-REB-NYW, 2015 WL 6376171, at *2 (D. Colo. Sept. 22, 2015).

Although Defendant is correct that an affirmative defense is not held to the same standard as a complaint, an affirmative defense must still satisfy the basic pleading requirements of Rule 8.  Under Rule 8, an "avoidance or affirmative defense" must be "simple, concise, and direct" and "affirmatively state[d]" in "short and plain terms." *Michaud v. Greenberg & Sada, P.C.*, No. 11-cv-01015-RPM-MEH, 2011 WL 2885952, at *2 (D. Colo. July 18, 2011) (quoting Fed. R. Civ. P. 8(b), (c), (d)).  When an employer asserts as an affirmative defense that an employee is exempt under the FLSA, the employee's exempt status "must be asserted at the pleading stage or it is waived." *Tripodi v. Microculture, Inc.*, 397 F. Supp. 2d 1308, 1316 (D. Utah 2005).

Defendant's belated assertion of the Commission Sales exemption violates Rule 8.  The generic statement that Defendant's conduct complied with federal and state labor regulations falls short of Rule 8(c)'s requirement that Defendant must "affirmatively state" its affirmative defenses.  Such cursory pleading gives Plaintiff little notice of the actual defense Defendant intends to raise in the litigation.  *See id.* at 1317 (finding defendants' "general denials" of FLSA coverage insufficient to "put [p]laintiff on notice" of defendants'

intent to rely on particular FLSA exception as an affirmative defense).  And as Plaintiff suggests, the inability to conduct discovery on an affirmative defense may cause prejudice that warrants a finding of waiver.  *Id.*; *see also* [Doc. 64 at 21].

But even if a defendant fails to "affirmatively state" an affirmative defense, "a technical failure to comply with Rule 8(c)" is not necessarily fatal.  *Ring v. Lexington Apartments & Motor Inns-Okla.*, 3 F. App'x 847, 851 (10th Cir. 2001) (quotation omitted).  "[T]he purpose behind [R]ule 8(c) is that of putting plaintiff on notice well *in advance of trial* that defendant intends to present a defense in the nature of an avoidance."  *Ball Corp. v. Xidex Corp.*, 967 F.2d 1440, 1443–44 (10th Cir. 1992) (brackets and quotation omitted) (emphasis added).  "In the absence of a showing of prejudice . . . an affirmative defense may be raised for the first time at summary judgment."  *Ring*, 3 F. App'x at 851 (quotation omitted); *see also Ball Corp.*, 967 F.3d at 1443 (finding no waiver when defendant failed to plead affirmative defense in answer but raised it in summary judgment motion three months before trial and the defense was "properly litigated at trial"); *Ahmad v. Furlong*, 435 F.3d 1196, 1201–02 (10th Cir. 2006) (holding that district court may deny constructive amendment of answer due to "undue delay, bad faith, or dilatory motive," but "strict adherence to the [Rule 8(c)] pleading requirement is inappropriate" when the plaintiff is not unfairly prejudiced).

Applying these principles, the Court finds no prejudice that precludes it from reaching the merits of the Commission Sales exemption.  Trial has not yet been scheduled for this case, and the class notice period began only recently.  *See* [Doc. 79].  Although Plaintiff complains she was unable to take discovery on the Commission Sales exemption, she does not contend that this affected her ability to respond to Defendant's

assertion of the exemption in its Motion.  [Doc. 64 at 20–21].  In fact, the summary judgment record confirms that the Parties have obtained all the facts necessary to "properly litigate" the applicability of the Commission Sales exemption.  *Cf. Ball Corp.*, 967 F.3d at 1443.  As set forth below, the exemption applies if (1) at least 50% of Ms. McAlister's earnings in a pay period derived from commission sales; (2) Ms. McAlister's regular rate of pay was at least one and one-half times the minimum wage; and (3) Defendant receives more than 75% of its annual dollar volume from retail sales.  The Parties have submitted Ms. McAlister's paystubs and employment contract (i.e., the Offer Letter), and do not dispute the role of retail sales in Defendant's annual dollar volume.  *See* UMF at ¶ 2.  Ms. McAlister identifies no other discovery that she was deprived from seeking that bears upon the analysis.[13]  *See generally* [Doc. 64].  The Court therefore agrees with Defendant that "all evidence concerning the commission sales exemption was produced in this case prior to the discovery cut-off."  [Doc. 73 at 15 (emphasis omitted)].

In sum, Defendant's belated assertion of the exemption affords Plaintiff adequate notice of the defense before trial, does not prevent Plaintiff from properly litigating the defense at summary judgment, and inflicts no other incurable prejudice.  For these

---

[13] Plaintiff's only articulated concern—aside from her frustration at Defendant's violation of Rule 8—appears to be that she lost the chance to obtain discovery on whether Defendant "willfully" misapplied the Commission Sales exemption. [Doc. 64 at 21]. But Defendant's willfulness is irrelevant to the application of the exemption itself.  *See* COMPS Order § 2.4.2.  Under the CWA, willfulness relates only to additional damages under Colo. Rev. Stat. § 4-4-109(3)(II) or the length of the limitations period under Colo. Rev. Stat. § 8-4-122. A ruling on the fully briefed merits of the Commission Sales exemption will not foreclose Plaintiff from raising these unrelated issues later.  And any discovery-related prejudice to Plaintiff is easily cured by permitting her additional discovery, should she request it, on the issue of Defendant's willfulness with respect to the Commission Sales exemption.

reasons, the Court respectfully finds it appropriate to address the merits of the Commission Sales exemption, "rather than relying upon procedural technicalities." *Clark v. Storey Wrecker Serv., Inc.*, No. 03-cv-00638-JHP-SAJ, 2006 WL 2130667, at *3 (N.D. Okla. July 28, 2006).

### 2.    Applicability of the Commission Sales Exemption

To demonstrate that the Commission Sales exemption covers Ms. McAlister, Defendant must show that (1) at least 50% of Ms. McAlister's earnings in a pay period were derived from commission sales ( "50% Requirement"); (2) Ms. McAlister's regular rate of pay was at least one and one-half times the minimum wage ("Minimum Wage Requirement"); and (3) Defendant receives more than 75% of its annual dollar volume from retail sales.[14]   COMPS Order § 2.4.2.  This third requirement is undisputed—the Parties agree that over 75% of LGI's annual dollar volume comes from retail sales.  UMF at ¶ 2.  The Court considers the first two requirements in turn.

---

[14] The Commission Sales exemption also applies only to sales employees in "retail or service industries."  COMPS Order #38 § 2.4.2.  COMPS Order #38 does not define "retail or service industries," but its predecessors defined "retail and service" industries to include real estate.  *See, e.g.*, Colorado Minimum Wage Order No. 35 ("MWO #35"), 7 Colo. Code. Regs. § 1103-1-2(A) (2019).  Starting in 2020, that definition was removed when CDLE restructured the COMPS Order's "coverage" provision.  *Compare* MWO #35 § 1, *with* COMPS Order #36, 7 Colo. Code Regs. § 1103-1-2.1 (2020).  Across all versions of the COMPS Order, however, the phrase "retail or service industries" in the Commission Sales exemption has remained the same.  *Compare* MWO #35 § 6(b), *with* COMPS Order #38 § 2.4.2.  Neither Party contends the meaning of "retail or service" changed when CDLE modified the coverage provision.  Accordingly, the Court assumes "retail or service industries," as used in the Commission Sales exemption, includes real estate salespersons in all editions of the COMPS Order promulgated during Ms. McAlister's employment with LGI.  *Cf. Rooftop Restoration, Inc. v. Am. Fam. Mut. Ins. Co.*, 418 P.3d 1173, 1176 (Colo. 2018) ("[Courts] aim to ascribe the same meaning to words or phrases used throughout a statutory scheme, absent any manifest indication to the contrary.").

### a.    50% Requirement

A sales employee satisfies the Commission Sales exemption's 50% Requirement if "at least 50% of their total earnings in the *pay period* is *derived from* commission sales." COMPS Order § 2.4.2 (emphasis added).  The COMPS Order defines neither "pay period" nor "derived from commission sales."  With respect to "pay period," however, the COMPS Order's recordkeeping provisions make clear that the relevant "pay period" is the time period used by an employer to track an employee's pay and generate an "earnings statement."  COMPS Order §§ 7.1(E), 7.2; *see also Schlapp ex rel. Schlapp v. Colo. Dep't of Health Care Pol'y & Fin.*, 284 P.3d 177, 180 (Colo. App. 2012) ("[Courts] read the provisions of a regulation together, interpreting the regulation as a whole." (citation omitted)).

While Ms. McAlister worked for LGI, each pay period was two weeks.  *See* [Doc. 51-18 (setting "period start" and "period end" dates as two weeks apart for each paycheck received by Ms. McAlister); Doc. 64-14 (stating that Ms. McAlister would receive a "Recoverable Draw of $1,384.62 per pay period")].  Accordingly, the Court rejects Defendant's contention that it is appropriate to assess Ms. McAlister's eligibility for the Commission Sales exemption by aggregating her pay across her entire six years at LGI. [Doc. 51 at 20–21].  The Court likewise disagrees with Plaintiff's contention that the Court should assume the COMPS Order's definition for a seven-day "workweek" is also the definition for a "pay period."  [Doc. 64 at 22–23]; *see also* COMPS Order § 1.13.  If CDLE intended the "workweek" to be the yardstick for determining whether the Commission Sales exemption applies, it would have said so.  *Cf. State v. Nieto*, 993 P.2d 493, 500 (Colo. 2000) (reiterating that courts strive to construe statutes "as written, giving full effect

to the words chosen, as it is presumed that the [promulgating body] meant what it clearly said").  Understanding "pay period" to mean the pay period used by an employer, the Court finds that Ms. McAlister must have derived at least 50% of her earnings in each two-week pay period from commission sales in order to meet the 50% Requirement.

Neither Party disputes that Ms. McAlister's Recoverable Draw earnings are "derived from" commission sales.  Ms. McAlister mentions in passing that she earned more "non-commissions" than "commissions" in some weeks, but she makes no effort to connect that vague argument to the Recoverable Draw or the "derived from" language in the COMPS Order.  [Doc. 64 at 23].  In the interest of completeness, the Court briefly considers whether the Recoverable Draw was "derived from" commission sales.  The COMPS Order does not define "derived from," so the Court looks to the ordinary meaning of the term.  *Gomez*, 509 P.3d at 440; *see also Derive*, Merriam Webster, https://www.merriam-webster.com/dictionary/derive (last visited March 17, 2025) ("to take, receive, or obtain especially from a specified source").

Having concluded that the Recoverable Draw is an advance taken from future commissions, the Court readily concludes that the Recoverable Draw is derived from commissions.  *See supra* Part I.A.  As explained above, Ms. McAlister's Recoverable Draw payments were advanced against her future commissions and then deducted from her earned commissions on a quarterly basis.  *Id.*  LGI expressly capped an employee's Recoverable Draw "deficit" at $12,000 and would stop paying the draw if the employee failed to earn commissions.  [Doc. 64-14].  The fact that LGI did not require repayment of outstanding Recoverable Draw amounts upon an employee's termination or resignation does not alter the analysis; neither Party contends the Recoverable Draw functioned as

26

a salary.  Record evidence confirms that the Recoverable Draw was inextricably tied to and taken from Ms. McAlister's commissions.  Of the $240,000 in Recoverable Draws paid to Plaintiff, LGI recouped all but about $10,000 of it from her commissions.  [Doc. 51-16].  The Court thus concludes that Plaintiff's Recoverable Draws were "derived from" commission sales and may be used in calculating whether she qualifies for the Commission Sales exemption.

Because Ms. McAlister's Recoverable Draw payments and commissions both derived from commission sales, she derived 100% of her earnings from commission sales regardless of whether she received a draw, commissions, or both in a given pay period. This satisfies the 50% Requirement.  Accordingly, Ms. McAlister will qualify for the Commission Sales exemption if she satisfies the Minimum Wage Requirement.

### b.    Minimum Wage Requirement and Regular Rate of Pay

An employee satisfies the Minimum Wage Requirement if "regular rate of pay is at least one and one-half times the minimum wage."  COMPS Order § 2.4.2.  The Court begins by determining Plaintiff's "regular rate of pay."  The COMPS Order defines "regular rate of pay" as "the hourly rate actually paid to employees for a standard, non-overtime workweek."  COMPS Order § 1.8.  When the employer pays employees on a commission or other non-hourly basis, "an hourly regular rate [is] calculated from the employee's pay." *Id.*

Rule 1.8.2 of the COMPS Order provides two methods for calculating an employee's hourly regular rate when the employee is paid on a non-hourly basis.  The first method provides that "the regular rate each workweek will be the total paid divided by hours worked."  § 1.8.2(A).  Plaintiff asserts, without explanation, that this formula

should apply.  [Doc. 64 at 22].  But for this method to apply, the parties must agree that the non-hourly pay is "supplemented by extra pay for all overtime hours."  § 1.8.2(A)(3). Plaintiff not only admits that LGI never paid her for overtime, but the lack of overtime is a basic premise of her claims, *see* [Doc. 64 at 3 ¶ 4; Doc. 73 at 11 ¶ 4; Doc. 64-3 at ¶ 11]. *See generally* [Doc. 7].

Because Plaintiff has not established the requirements for the first method of calculating her hourly regular rate, the second method applies as outlined in rule 1.8.2(B). That provision explains that "the hourly regular rate is the applicable weekly pay divided by 40, the number of hours presumed to be in a workweek for an employee paid no overtime premium."  § 1.8.2(B).  This calculation should be undertaken for each week of the employee's tenure.  *See Brennan*, 535 P.3d at 1023 (approving overtime claim in context of Commission Sales exemption when the employee received less than one and a half times the minimum wage in "certain weeks," because the applicable COMPS Order "plainly establishes the seven-day week as the framework for assessing the applicability of overtime").  In short, Ms. McAlister will meet the Minimum Wage Requirement for weeks where her commissions, draws, and volume bonus[15] amount to at least one and one half times Colorado's minimum wage.

Colorado's minimum wage increased throughout Ms. McAlister's tenure at LGI. For reference, the Court provides a chart listing the applicable minimum wage and the "one and one-half times the minimum wage" cutoff for each year of Ms. McAlister's employment:

---

[15] The COMPS Order provides that "production bonuses" should be included in an employee's regular rate of pay.  COMPS Order § 1.8.1.

| Year | Minimum Wage | One and One-half Cutoff |
|------|--------------|-------------------------|
| 2016 | $8.31 | $12.47 |
| 2017 | $9.30 | $13.95 |
| 2018 | $10.20 | $15.30 |
| 2019 | $11.10 | $16.65 |
| 2020 | $12.00 | $18.00 |
| 2021 | $12.32 | $18.48 |
| 2022 | $12.56 | $18.84 |
| 2023 | $13.65 | $20.48 |

*See State Minimum Wage Rate for Colorado*, Fed. Rsrv. Bank of St. Louis, https://fred.stlouisfed.org/series/STTMINWGCO (Jan. 1, 2025, 1:48 PM).[16]

For some pay periods, the Recoverable Draw alone places Ms. McAlister above the cutoff and satisfies the Minimum Wage requirement. In pay periods when Ms. McAlister received only the Recoverable Draw, her regular rate of pay can be calculated as $1,384.62 in draw, divided by 2 weeks in a pay period, divided by 40 hours in a non-overtime workweek, to yield a regular hourly rate of $17.31. *See* COMPS Order § 1.8.2(B). That means Ms. McAlister's regular rate of pay exceeded "one and one-half times the minimum wage" for every pay period in 2016 through 2019. Similarly, in October 2022, LGI increased the draw amount to $1,661.58 or above. *See* [Doc. 51-18 at 158–62, 184–87]; *see also* [Doc. 51-3 at 46:21–23]. Repeating the above calculation, Ms.

---

[16] Rather than cite to eight editions of the COMPS Order, the Court takes judicial notice of the Federal Reserve's consolidated data. *See* Fed. R. Evid. 201(b)(2) (permitting judicial notice of facts that "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned").

McAlister's regular hourly rate was at least $20.77 for pay periods in October 2022 or later, which satisfies the Minimum Wage Requirement cutoffs for 2022 and 2023. In other words, Ms. McAlister fell within the Commission Sales exemption to the COMPS Order's overtime requirements for every pay period in 2016 to 2019, and from October 2022 onward. The Overtime Claims are therefore precluded with respect to these pay periods. The Court also observes that, for some periods in 2020, 2021, and January through September of 2022, Ms. McAlister's commission earnings will place her above the cutoff for the Minimum Wage Requirement, and she may not assert the Overtime Claims for those pay periods.

Applying this framework to the record before it, this Court concludes that no genuine issues of material fact remain as to whether the Commission Sales exemption applies to Plaintiff for pay periods in 2016 through 2019, pay periods in October 2022 or later, and any other pay period where Plaintiff's regular hourly rate meets the cutoff for the Minimum Wage Requirement. To the extent Plaintiff seeks overtime pay for these pay periods, the Motion is **GRANTED**, and the Overtime Claims are **DISMISSED with prejudice**.

### III. Rest Breaks

Defendant seeks summary judgment on Plaintiff's Rest Breaks Claims on the basis that it fully complied with the COMPS Order's rest breaks requirements. [Doc. 51 at 21–24]. Rule 5 of the COMPS Order requires employers to "authorize and permit" employees to take compensated rest breaks. COMPS Order § 5.2. By its plain language, the phrase "authorize *and* permit" contains both a formal and a practical dimension. In other words, to comply with this requirement, an employer must not only formally "authorize" rest

breaks, but "permit" the breaks in practice.  *See Authorize*, Black's Law Dictionary (12th ed. 2024) ("To formally approve; to sanction"); *Permit*, Black's Law Dictionary (12th ed. 2024) ("To give opportunity for" or "[t]o allow or admit").  The COMPS Order is silent, however, as to how disruptive a workplace practice must be for an employee to be effectively not permitted to take rest breaks.  Finding no other clues in the text, structure, or history of the COMPS Order itself,[17] the Court looks to CDLE's interpretation for guidance in resolving the ambiguity.

The Colorado Supreme Court has recognized that "an agency's reasonable interpretation" of its ambiguous regulation is entitled to "respect" if it carries the "power to persuade."  *See Gomez*, 509 P.3d at 441 (quoting *Christensen v. Harris Cnty.*, 529 U.S. 576, 586–87 (2000)); *see also Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944).  An agency's interpretation is persuasive when the interpretation is thorough, comprehensive, and "constitutes a body of experience and informed judgment to which courts and litigants may properly resort for guidance."  *Gomez*, 509 P.3d at 441 (citing *Skidmore*, 323 U.S. at 140).

Plaintiff urges the Court to adopt the interpretation of "authorize and permit" set forth in CDLE's Interpretive Notice & Formal Opinion #4 ("INFO #4").  [Doc. 64 at 25–26 & n.66; Doc. 64-28].  In relevant part, the INFO #4 provides that

> If an employer asserts that an employee had permission to take a rest period, but in reality the employee was unable or discouraged to do so, then a rest period was not "authorized and permitted."  "Authorize" means formal permission to take a rest period, but "permit" means, given workplace realities, the employee actually was able to take a rest period without repercussions.  A handbook, policy, or schedule that appears to allow a rest

---

[17] The phrase "authorize and permit" remained consistent and undefined throughout Ms. McAlister's tenure at LGI.  *See, e.g.*, MWO #35 § 8 ("Every employer shall authorize and permit rest periods.").

period is not conclusive evidence a rest period was authorized or permitted, if the employee provides evidence that workplace realities created either pressure to skip, or practical obstacles to taking, a rest period. Possible evidence an employer did not in reality permit rest periods may include that the employer:

1) pressured an employee not to take rest periods;
2) knew an employee's workload, schedule, deadline, or quota made rest periods infeasible; and/or
3) did not adequately inform employees that rest periods were paid

[Doc. 64-28 at 3 (footnote omitted)]. Upon review, the Court agrees with Plaintiff that the INFO #4 is sufficiently persuasive to merit "respect" under *Gomez* and *Skidmore*. [Doc. 64 at 25 n.6]. The INFO #4 thoroughly addresses the COMPS Order's meal and rest break requirements and reflects CDLE's institutional expertise. Its construction of "authorized and permitted" is consistent with the phrase's plain meaning as discussed above. *See Gomez*, 509 P.3d at 441 (according *Skidmore* deference to CDLE bulletin that interpreted regulatory terms "in line with those terms' plain and ordinary meaning"). The INFO #4 also retains the breadth of the phrase "authorized and permitted" as used in the COMPS Order itself. For instance, CDLE clarifies that a written policy alone is not "conclusive" of an employer's compliance. [Doc. 64-28 at 3]. And while the INFO #4 outlines "possible" evidence to prove "workplace realities" do not permit rest breaks, it does not purport to be exhaustive. [*Id.*]. Satisfied that the INFO #4 carries the "power to persuade," Court turns to whether, under the INFO #4 and the text of COMPS Order § 5.2, genuine issues of material fact remain as to whether Defendant authorized and permitted its sales representatives to take rest breaks.

Defendant argues that LGI's policies authorized Plaintiff to take rest breaks and Plaintiff's phone records demonstrate that there is no genuine issue of material fact that Ms. McAlister was permitted to take breaks while working for LGI. [Doc. 51 at 21–24].

The Court respectfully disagrees on both fronts.  Assuming Defendant's written policies actually applied to Plaintiff, *see* [Doc. 40-6; Doc. 64 at 9 ¶ 8], the INFO #4 advises that a written policy alone does not mean an employer has authorized and permitted rest breaks, [Doc. 64-28 at 2]; *cf. Valdez v. Universal Logistics of Va.*, No. 23-cv-01015-PAB-KAS, 2024 WL 4346407, at *11 (D. Colo. Sept. 30, 2024) (observing that, based on the INFO #4, "it seems doubtful that a written policy is required" to establish compliance with the rest breaks requirements).  To the extent these written policies show LGI authorized rest breaks, they are at least partially undermined by the fact that an LGI executive informed Plaintiff that LGI considered her exempt from paid rest breaks.  *See* [Doc. 64-8 at 2].  Defendant is correct that LGI could have authorized and permitted rest breaks even if it believed breaks were not required.  [Doc. 73 at 18].  But the Court must view the record in the light most favorable to Ms. McAlister, and the task of weighing competing pieces of evidence belongs to the jury, not the Court at summary judgment.  *See Fogarty*, 523 F.3d at 1165.

The facts regarding the "workplace realities" at LGI are also in dispute.  *See* [Doc. 64-28 at 2].  Ms. McAlister and numerous other LGI employees have averred that LGI implemented a quota and queue system that pressured employees to skip rest breaks. *See, e.g.*, [Doc. 64-3 at ¶¶ 12–14; Doc. 64-4 at ¶¶ 8–9; Doc. 64-6 at ¶¶ 6–7; Doc. 64-7 at ¶¶ 5, 9–10, 16].  At summary judgment, the Court cannot credit Defendant's assumption that Ms. McAlister took a rest break every time she answered her phone.  [Doc. 51 at 23]; *see Banner Bank*, 916 F.3d at 1326.  Nor can the Court weigh the dueling evidence of whether the "workplace realities" at LGI actually permitted rest breaks.  [Doc. 64-28 at 2]; *Fogarty*, 523 F.3d at 1165.  Because Defendants fail to establish that there are no genuine

issues of material fact as to whether LGI authorized and permitted rest breaks, the Motion is respectfully **DENIED** as to the Rest Breaks Claims.[18]

## CONCLUSION

For the reasons set forth herein, **IT IS ORDERED** that:

(1)    Defendant LGI Homes Corporate, LLC's Motion for Summary Judgment Pursuant to Fed. R. Civ. P. 56 [Doc. 51] is **GRANTED in part** and **DENIED in part**;

(2)    Plaintiff's Paycheck Deductions Claim is **DISMISSED with prejudice**;

(3)    Plaintiff's Overtime Claims are **DISMISSED in part with prejudice** to the extent Plaintiff seeks overtime pay for pay periods in 2016 through 2019, pay periods in October 2022 or later, and any other pay period where Plaintiff's regular hourly rate was at least one and one-half times the applicable minimum wage;

(3)    The Motion is **DENIED** with respect to the Rest Breaks Claims; and

(4)    A telephonic Status Conference is **SET** for **April 10, 2025 at 1:30 p.m.** for purposes of discussing the amendment of the Notice of Wage and Hour Class Action and the next steps in this action.  Counsel for the Parties shall participate using the following dial-in information:  **571-353-2301; Access Code:  783456374**.

---

[18] The Parties appear to assume that the Rest Breaks Claims also include a claim that LGI violated Plaintiff's right to meal breaks under COMPS Order § 5.1.  *See* [Doc. 51 at 24; Doc. 64 at 27 n.70].  But the Complaint does not allege that LGI deprived Plaintiff of meal breaks—in fact, it makes no mention of meal breaks at all.  *See generally* [Doc. 7]. The Rest Breaks Claims, as the label suggests, expressly seek to recover for lost rest breaks only.  [*Id.* at ¶¶ 51–56, 71–74].  Accordingly, the Court does not address the Parties' arguments with respect to meal breaks.

DATED:  March 18, 2025                    BY THE COURT:

_____
Nina Y. Wang
United States District Judge